**UNITED STATES of America, Plaintiff–Appellee,**

v.

**George Paul SALEMO, Defendant–Appellant.**

No. 95–10028.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 1996.

Decided April 10, 1996.

Rehearing En Banc Dismissed May 28, 1996.

Artmore L. Baggot, Phoenix, Arizona, for defendant-appellant.

Mark E. Aspey, Assistant United States Attorney, Phoenix, Arizona, for plaintiff-appellee.

Before ALARCON, KLEINFELD and HAWKINS, Circuit Judges.

ALARCON, Circuit Judge:

This appeal presents a novel question: Does section 3006A of the Criminal Justice

Act require a district court to compensate an attorney who serves solely as an advisor at the request of an indigent defendant who has asserted his or her right to self representation? We conclude that section 3006A does not authorize a district court to compensate an attorney whose service as a legal advisor is requested by the defendant.[1]

Salemo's appellate counsel also challenges the order granting the Government's motion to set aside the plea agreement, and the validity of the court's sentencing decision. We consider each of these issues in this opinion. We have jurisdiction to review the judgment of conviction pursuant to 28 U.S.C. § 1291, and the validity of the sentencing decision under 18 U.S.C. § 3742(a).

Salemo's request that he be permitted to file a pro se supplemental brief in this matter was granted by this court. None of the issues raised in the supplemental brief meet the criteria for publication set forth in our Circuit Rule 36–2. We have addressed these separate contentions in an unpublished memorandum disposition filed on this date.

# I

No issue has been raised by Salemo's counsel concerning the sufficiency of the evidence to support the judgment of conviction. Accordingly, a brief summary of the pertinent facts and procedural background will serve as a prelude for our analysis of the issues presented for review by Salemo's counsel.

Salemo's recorded criminal history began in 1965. At the age of 21, he was convicted in Pennsylvania of forging checks on the account of a college fraternity. In 1977,

Salemo was convicted of mail fraud in the Eastern District of Pennsylvania in connection with the sale of short-term, high interest notes from an insolvent company. In 1980, Salemo was convicted in a Pennsylvania state court for writing a check with insufficient funds in his bank account. In 1982, Salemo was again convicted of forgery in Pennsylvania.

His criminal activity in Pennsylvania overlapped with his fraudulent conduct in Florida. In 1980, Salemo purchased a bankrupt Florida airline company by promising to pay $250,000. He submitted false financial documents to demonstrate his ability to perform his part of the bargain. Salemo failed to pay the purchase price. Meanwhile, he illegally converted some of the airline's assets. These activities resulted in a 1983 conviction in the District of Florida for wire fraud, transportation of fraudulent securities, and embezzlement.

While on parole from his Florida conviction, Salemo moved to Arizona and submitted falsified financial statements to Western Savings & Loan in an attempt to procure a real estate loan. Salemo also wrote thousands of dollars worth of bad checks. In 1985, he was convicted for these offenses in an Arizona state court and sentenced to seven years in prison.

In 1988, Salemo was placed in a Phoenix, Arizona halfway house in the waning phase of his imprisonment. While on leave from the halfway house, Salemo commenced loan negotiations with several financial institutions. Salemo represented that he was a wealthy New York businessman who visited Phoenix on the weekends. To disguise the fact that he was really an unemployed pris-

---

**1.** In his petition for rehearing, Salemo concedes that "the Criminal Justice Act does not authorize payment" for the appointment of advisory counsel. Salemo argues for the first time that the appointment he requested should have been made pursuant to 5 U.S.C. § 3109 and the Guide To Judiciary Policies And Procedures ("Guide").

The Guide in pertinent part provides as follows:

> [I]n circumstances in which appointment is made under the court's inherent authority, and counsel serves exclusively on behalf of the court to protect the integrity and continuity of the proceedings, and does not represent the defendant, *any compensation to be paid counsel*

> *shall be in the capacity of an 'expert consultant'* pursuant to 5 U.S.C. § 3109.

Guide To Judiciary Policies And Procedures, Volume VII, Appointment Of Counsel In Criminal Cases, ¶ 2.17 (June 9, 1993) (emphasis added).

In this case, the district court did not appoint counsel to assist it in protecting the integrity and continuity of the court proceedings, nor was it recommended to the court that it do so *sua sponte*. Instead, the district court rejected Salemo's motion "for leave to proceed in pro se with advisory counsel." Thus, the question whether a district court is authorized pursuant to section 3109 to compensate an attorney it has appointed to serve exclusively on behalf of the court as an expert consultant is not before us.

oner, Salemo stayed at an expensive suite and often negotiated his deals by the pool of the luxurious Princess Resort. To create a false impression of his financial status, Salemo arranged to have expensive Rolex watches delivered to him during these poolside meetings. Salemo also purchased a new $30,000 Corvette with a fraudulently obtained loan, leased a new SEL Mercedes Benz, and arranged to have a stretch limousine service on call 24 hours a day. Over the course of his negotiations, Salemo submitted a false social security account number and numerous falsified financial documents to several banks. Salemo also arranged to have an accomplice contact the institutions to "verify" his bogus financial status.

By the time Salemo was arrested in December 1988, Salemo had managed to negotiate a $30,000 loan from Citibank. Salemo also had attempted to obtain a $450,000 loan from Guardian Bank, a $2.4 million loan from Pioneer Bank, and a $4.3 million loan from Chase Bank. In addition, Salemo was $12,502 overdrawn on his Citibank account and was delinquent in making payments for purchases made with his Citibank credit card. He had also failed to meet the payment schedule on the lease agreement for the use of the Mercedes.

On October 4, 1989, a federal grand jury in the District of Arizona indicted Salemo on six counts of wire fraud in violation of 18 U.S.C. § 1343, eight counts of false statements to financial institutions in violation of 18 U.S.C. § 1014, and three counts of the use of false social security account numbers in violation of 42 U.S.C. § 408(g)(2). On May 8, 1990, pursuant to a written plea agreement, Salemo entered pleas of guilty to five of the seventeen counts. Under the plea agreement, Salemo was released from custody, *prior* to sentencing, so that he could cooperate in an investigation conducted by the Pennsylvania Crime Commission.

Once in Pennsylvania, however, Salemo sought to defraud two banks by opening checking accounts and depositing several hundred thousands of dollars of worthless checks. Salemo was arrested on October 2, 1991, for bank fraud in the Eastern District of Pennsylvania.

On December 12, 1991, the district court in Arizona sentenced Salemo to 176 months. Salemo appealed from this sentence. On March 25, 1993, we vacated the guilty plea because of a violation of Rule 11 of the Federal Rules of Criminal Procedure and remanded this matter to the district court for further proceedings. *United States v. Salemo*, C.A. Nos. 92–10029, 92–15170, 1993 WL 84961 (9th Cir. March 25, 1993). While this matter was pending in the district court, Salemo went to trial in the District of Pennsylvania. On April 5, 1994, he was convicted of bank fraud. He was sentenced to serve eight years in prison.

On June 7, 1994, the district court granted the Government's motion "to vacate and/or reject the plea agreement" and set the matter for trial. On July 13, 1994, Salemo proceeded to trial. The jury returned guilty verdicts on all counts. On January 6, 1995, the district court sentenced Salemo to a term of imprisonment of 120 months. The district court ordered that the sentence be served consecutively to the sentence imposed by the District Court for the Eastern District of Pennsylvania.

## II

Salemo's counsel contends that the district court erred in ruling that, as a matter of law, the Criminal Justice Act does not confer discretion to compensate advisory counsel with public funds. He further asserts that the failure to allow Salemo to represent himself with the assistance of a "standby counsel," compensated pursuant to the Criminal Justice Act, is a structural defect compelling reversal without a demonstration of prejudice.[2]

---

**2.** Salemo's counsel uses the terms "standby" and "advisory" counsel interchangeably. This circuit has defined the words "advisory counsel" to describe the "situation when a pro se defendant is given technical assistance by an attorney in the courtroom, but the attorney does not participate in the actual conduct of the trial." *Locks v. Sumner*, 703 F.2d 403, 407 (9th Cir.), *cert. denied*, 464 U.S. 933, 104 S.Ct. 338, 78 L.Ed.2d 307 (1983). The term "standby counsel" refers to an attorney appointed by the court to be prepared to represent the defendant if the defen-

■ We review for abuse of discretion a district court's ruling on a request for advisory counsel from an indigent defendant who has elected to represent himself. *Locks,* 703 F.2d at 407; *United States v. Halbert,* 640 F.2d 1000, 1009 (9th Cir.1981). We review *de novo* a district court's interpretation of a statute. *United States v. Ripinsky,* 20 F.3d 359, 361 (9th Cir.1994).

Salemo's counsel has directed our attention to the fact that in 1992, the district court had granted Salemo's request for the appointment of advisory counsel to consult with him during contempt proceedings. The district court approved vouchers submitted by Salemo's counsel for these services.

On June 29, 1994, Salemo filed his motion for "leave to proceed in pro se with advisory counsel" at the guilt phase of the trial in this matter. The district court informed Salemo that "there is no provision for compensation [for advisory counsel] under the Criminal Justice Act." Salemo argued that he had a statutory and constitutional right to proceed with advisory counsel who would be compensated under the Criminal Justice Act. The district court denied Salemo's request that advisory counsel be appointed and compensated under the provisions of the Criminal Justice Act. The court ruled that Salemo "had an absolute right to represent [himself], presuming the court can make certain findings, but that there will not be paid advisory counsel if the Court grants the motion." The court also advised Salemo that he could represent himself with advisory counsel who was willing to serve *pro bono publico.* Following this ruling, Salemo informed the court that he did not wish to represent himself if his advisory counsel would not be paid for his services under the Criminal Justice Act. Salemo was represented by appointed counsel at his trial.

Salemo's counsel has not cited any authority to support his argument that the Criminal Justice Act authorizes payment for the services of an attorney who served as a legal advisor to a defendant acting in *pro se.* In fact, he concedes that the Criminal Justice Act "does not specifically address the practice of appointment of standby counsel at

public expense," and that the appointment of "standby counsel" is discretionary.

A proper resolution of this question requires an examination of the case law which sets forth the circumstances that compel a trial court to appoint counsel. We must also construe section 3006A of the Criminal Justice Act to determine whether it authorizes payment for the legal advice rendered by an attorney requested by a defendant who has waived the right to be represented by counsel.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has construed the words "Assistance of Counsel" to mean representation by counsel. In *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the Court instructed that "[t]he constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel." *Id.* at 465, 58 S.Ct. at 1023. In *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), the Court held that "absent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, *unless he was represented by counsel* at his trial." *Id.* at 37, 92 S.Ct. at 2012 (emphasis added). The Supreme Court has not addressed the question whether an attorney appointed to represent an indigent is entitled to be compensated out of public funds.

■ In *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Court held that the Sixth Amendment also "grants to the accused personally the right to make his defense." *Id.* at 819, 95 S.Ct. at 2533. Thus, an indigent defendant facing criminal prosecution for a crime that is punishable by imprisonment has a federal constitutional right to be represented by court appointed counsel, or to present his or her own defense, without the assistance of counsel.

dant's self representation is terminated. *McKaskle v. Wiggins,* 465 U.S. 168, 176, 104 S.Ct. 944, 949–50, 79 L.Ed.2d 122 (1984). The record

demonstrates Salemo requested the appointment of advisory counsel in this matter.

The First Congress incorporated the right of an accused to be represented by counsel, or to present his or her own defense in section 35 of the Judiciary Act of 1789, 1 Stat. 73, 92 (1789). Section 35 of the Judiciary Act provided "[t]hat in all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of such counsel or attorneys at law as by the rules of the said courts respectively shall be permitted to manage and conduct causes therein."

In 1948, these rights were codified in 28 U.S.C. § 1654. Section 1654 provides in pertinent part that "[i]n all courts of the United States the parties may plead and conduct their own cases personally or by counsel. . . ." Section 1654 does not authorize federal courts to compensate counsel appointed to represent indigent defendants.

From 1937 until 1963, the American Bar Association, the Department of Justice, and the Judicial Conference of the United States sponsored or endorsed legislation to provide compensation for counsel appointed to represent indigent defendants in the federal courts. H.R.Rep. No. 88–864, 88th Cong., 2d Sess. (1964), U.S.Code Cong. & Admin.News 1964, p. 2990. During that period of history, several bills were introduced in the House of Representatives which would have authorized compensation for appointed counsel. Prior to 1963, none of this proposed legislation was reported out of committee.

In 1963, President John F. Kennedy and Attorney General Robert F. Kennedy urged Congress to enact legislation to provide funds to compensate counsel appointed to *represent* persons accused of a federal crime. President Kennedy expressed his concerns in the following letter to House Speaker John W. McCormack:

> DEAR MR. SPEAKER: To diminish the role which poverty plays in our Federal system of criminal justice, I am transmitting for consideration by the Congress proposed legislation to assure effective legal *representation* for every man whose limited means would otherwise deprive him of an adequate defense against criminal charges. The need to protect this basic right makes enactment of this measure imperative.

> In the typical criminal case the resources of government are pitted against those of the individual. To guarantee a fair trial under such circumstances requires that each accused person have ample opportunity to gather evidence, and prepare and present his cause. Whenever the lack of money prevents a defendant from securing an experienced lawyer, trained investigator or technical expert, an unjust conviction may follow.

> The Attorney General's accompanying letter describes the deficiencies in the present system. These defects have prevailed for many years despite persistent pleas for legislation by the judicial and executive branches and the organized bar. Fairness dictates that we delay no longer.

> I commend the proposed Criminal Justice Act of 1963 for prompt and favorable action by the Congress. Its passage will be a giant stride forward in removing the factor of financial resources from the balance of justice.

H.R.Rep. No. 88–864, 88th Cong., 2d Sess. (1964), U.S.Code Cong. & Admin.News 1964, p. 2990 (emphasis added).

In his letter to President Kennedy, Attorney General Robert F. Kennedy set forth the reasons that persuaded him to seek Congressional approval for compensation for court appointed counsel:

> Under typical procedures prevailing in the Federal system, no attorney is appointed to *represent* the needy defendant until he is arraigned, that is, required to plead to the charge against him. The preliminary examination before the commissioner and the grand jury stage pass without the accused having the benefit of counsel or investigation. The case for the defense is then committed to an attorney who will receive no fee for his services or reimbursement for his expenses, and who has no investigators to check facts or experts to analyze evidence. Sometimes these drawbacks will be offset by assigning to the defendant an experienced criminal trial practitioner who may subsidize the defense out of his own pocket. Far more often, however, the assignment will go to a young and inexperienced lawyer, unable to fi-

nance the careful search for witnesses and evidence and the time-consuming preparation and trial which an adequate defense may demand. *Representation* so limited—late in time, lacking in money, and short on experience—is *representation* far short of that contemplated by the framers of our Constitution.

The response of lawyers to appointments by the court to *represent* the poor is one of the finest traditions of the American Bar; but the circumstances under which counsel in such cases must defend against skilled prosecutors with extensive factfinding resources at their disposal substantially reduce the likelihood for doing justice before the law.

The proposed Criminal Justice Act seeks to remedy some of the defects which poverty has imposed on our system of criminal justice. The mission of the bill is threefold: to define the *representation* rights of every defendant, to require the establishment of workable plans to make these rights operative throughout the Federal system and to confine public payment for *representation* to the cases of those who cannot privately afford it.

H.R.Rep. No. 88–864, 88th Cong., 2d Sess. (1964), U.S.Code Cong. & Admin.News 1964, p. 2990 (emphasis added).

Congress adopted the Criminal Justice Act in 1964. Section 3006A was added to Title 18. Pub.L. No. 88–455; 78 Stat. 552 (codified as 18 U.S.C. § 3006A (1964)). It expressly authorized the federal courts to compensate counsel appointed to provide "representation" for indigent defendants in section 3006A(a)[3] and (d).[4] The statute does

not authorize payment for the services of "standby" or "advisory" counsel.

Salemo's counsel asserts correctly that the Supreme Court approved the appointment of standby counsel where the defendant has waived his right to counsel. In *Faretta,* the court observed that:

> [A] State may—even over objection by the accused—appoint a "standby counsel" to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.

*Faretta,* 422 U.S. at 835 n. 46, 95 S.Ct. at 2541 n. 46. In *McKaskle,* the court stated:

> [W]e make explicit today what is already implicit in *Faretta:* A defendant's Sixth Amendment rights are not violated when a trial judge appoints standby counsel—even over the defendant's objection—to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals.

*McKaskle,* 465 U.S. at 184, 104 S.Ct. at 954.

The Supreme Court's observation, that it may be wise to appoint standby counsel for a defendant who wishes to waive representation by counsel, does not resolve the question whether a district court is compelled to grant a defendant's *pro se* request for the appointment of advisory counsel, and to order that this service must be compensated under section 3006A.

In *United States v. Kienenberger* 13 F.3d 1354 (9th Cir.1994), the district court ap-

---

3. Section 3006A(a) now provides in pertinent part:
   Each United States district court, with the approval of the judicial council of the circuit, shall place in operation throughout the district a plan for furnishing representation for any person financially unable to obtain adequate representation in accordance with this section. Representation under each plan shall include counsel and investigative, expert, and other services necessary for adequate representation.

4. Section 3006A(d) provides in pertinent part:
   Any attorney appointed pursuant to this section or a bar association or legal aid agency or

community defender organization which has provided the appointed attorney shall, at the conclusion of the representation or any segment thereof, be compensated at a rate not exceeding $60 per hour for time expended in court or before a United States magistrate and $40 per hour for time reasonably expended out of court, unless the Judicial Conference determines that a higher rate of not in excess of $75 per hour is justified for a circuit or for particular districts within a circuit, for time expended in court or before a United States magistrate and for time expended out of court.

pointed the public defender to represent the appellant. The court granted the appellant's request to replace his court-appointed counsel. The court appointed a second public defender. *Id.* at 1356. Thereafter, the appellant informed the court that he was dissatisfied with his attorney. He advised the court that he wanted to represent himself and requested advisory counsel to assist him on procedural matters. *Id.* The trial court admonished the appellant that he had a constitutional right to represent himself, but had no right to advisory counsel. *Id.* In affirming the district court's denial of advisory counsel, we held that a defendant does not have a constitutional right "to represent himself and have access to 'advisory' or 'consultative' counsel at trial." *Id.* We ruled in *Kienenberger* that the district court did not abuse its discretion in denying the appellant's request for advisory counsel. *Id.* We also concluded that because the appellant's request to represent himself was accompanied by his insistence that the court appoint advisory or standby counsel, "Kienenberger never relinquished his right to be represented by counsel at trial." *Id.*

Here, Salemo, in asserting his right to self representation not only insisted that the court appoint advisory counsel, but also argued that the court was required to compensate his consultant pursuant to the Criminal Justice Act. Thus, Salemo did not unequivocally relinquish his right to representation by counsel. When advised that he did not have a right to the appointment of an advisor to be paid at public expense, Salemo withdrew his waiver of counsel. The district court's instruction to Salemo that he had a constitutional right to represent himself, but had no right to advisory counsel, was consistent with the law of this circuit as reflected in *Kienenberger*. The district court did not err as a matter of law in holding that section 3006A does not authorize payment for the services of advisory counsel. As discussed above, section 3006A(d) of the Criminal Justice Act authorizes payment for the services of an attorney appointed to represent an indigent defendant. It does not authorize a district court to compensate advisory counsel requested by a defendant who has waived his right to representation by counsel.

■ In his reply brief, Salemo's counsel argues that the district court failed to exercise its discretion to appoint advisory counsel because of its belief that the Criminal Justice Act does not authorize compensation for consultative or advisory services. We review *de novo* a district court's ruling that it lacks legal authority to exercise its discretion. *United States v. Belden,* 957 F.2d 671, 676 (9th Cir.), *cert. denied,* 506 U.S. 882, 113 S.Ct. 234, 121 L.Ed.2d 169 (1992). Because we conclude that the Criminal Justice Act does not authorize payment for the services of advisory counsel, the district court lacked the power to grant Salemo's motion.

### III

■ Salemo's counsel argues that the district court erred in failing to sentence him according to the terms of the plea agreement. We review a district court's interpretation of the terms of a plea agreement *de novo.* *United States v. Floyd,* 1 F.3d 867, 869 (9th Cir.1993). We consider whether the facts demonstrate that there was a breach of a plea agreement under the more deferential clearly erroneous standard of review. *United States v. Roberts,* 5 F.3d 365, 370 (9th Cir.1993).

The record shows that Salemo and the Government entered into a plea agreement on May 8, 1990. Salemo entered a plea of guilty to five of the seventeen counts in the indictment on the same date. Sentencing was delayed, pursuant to the plea agreement, to permit Salemo to cooperate with the Pennsylvania Crime Commission in its investigation of organized crime in that state. While awaiting sentencing, Salemo committed new crimes in the State of Pennsylvania. This post plea criminal activity was reflected in the presentence report. Salemo was sentenced to serve 176 months on December 12, 1991. Pursuant to the plea agreement, the remaining counts were dismissed. We vacated the sentence on March 25, 1993, because of a Rule 11 violation.

On June 7, 1994, the district court granted the Government's motion to vacate and/or reject the plea agreement. The court denied Salemo's motion for a declaration that the

sentencing provisions of the plea agreement would be applicable if the jury were to find him guilty. The court reinstated the dismissed counts. Salemo was found guilty of each of the seventeen counts in the original indictment filed October 4, 1989. Salemo was sentenced on January 6, 1995, to serve a term of 120 months in prison. The sentence was ordered to be served consecutively to the sentence imposed by District Court for the Eastern District of Pennsylvania.

There is no factual dispute regarding whether Salemo breached the plea agreement. Instead of cooperating with the Pennsylvania Crime Commission, Salemo engaged in fraudulent criminal activity. The plea agreement expressly provided that Salemo "shall comply with all release conditions imposed by the court, including those conditions set forth by the court, on April 27, 1990." The release conditions included the following restriction: "The defendant shall not commit any offense in violation of federal, state or local law while on release."

Salemo's counsel argues that the Government waived its right to claim that Salemo breached the plea agreement when it failed to move to vacate it prior to the imposition of sentence on December 12, 1991. This argument has no relevance to the validity of the sentence imposed by the court on January 6, 1995. Whether the Government had the right to repudiate the plea agreement prior to the imposition of sentence on December 12, 1991, became moot when we vacated Salemo's plea of guilty.

The plea agreement also provided that:

If defendant's guilty plea is rejected, withdrawn, vacated or reversed, at any time, the United States will be free to prosecute the defendant for all charges of which it has knowledge, and *any charges that have been dismissed because of this plea agreement will be automatically reinstated.*

(emphasis added). Thus, when Salemo's plea was vacated, the plea agreement was nullified *ex proprio vigore.* The Government and Salemo were restored to the position they were in before Salemo agreed to enter a plea of guilty to five counts in exchange for a promise by the Government to recommend a reduced sentence that would reflect the ex-

tent of Salemo's cooperation in the investigation and prosecution of others. The vacation of Salemo's guilty plea, and the automatic reinstatement of the dismissed counts also served to nullify the plea agreement. In light of Salemo's flagrant breach of the promises he had made to induce the Government to recommend a plea to only 5 of 17 counts, the Government was understandably unwilling to bargain with him again.

Salemo's reliance on *United States v. Garcia,* 519 F.2d 1343 (9th Cir.1975), is misplaced. In *Garcia,* the Government failed to abide by the express terms of a deferred prosecution agreement. The Government had agreed to delay indicting the defendant for a period of time to allow him to attempt to produce a drug dealer. *Id.* at 1344. If the defendant failed to produce, the Government had a fixed period of time to seek an indictment. *Id.* No dealer was produced and, after the time had elapsed, the Government belatedly sought and obtained an indictment. *Id.* The defendant unsuccessfully moved the district court for an order dismissing the indictment. *Id.* at 1344. Because the defendant had relied to his detriment on an agreement violated by the Government, we reversed the district court with instruction to dismiss the indictment. *Id.* at 1345.

Salemo relies on *Garcia* for the proposition that the fact that a defendant has breached a plea agreement does not relieve the Government from its duty to perform its promises. *Garcia* is inapposite because it involved a breach of an agreement by the Government. In this case, notwithstanding Salemo's material breach of the agreement, the Government did not seek to repudiate the agreement on December 12, 1991, prior to the imposition of sentence on the five counts to which Salemo pled guilty. Furthermore, the Government agreed to the dismissal of the remaining counts in the indictment. Unlike the situation in *Garcia,* the Government fulfilled its obligations under the plea until it was nullified by this court's order vacating the guilty pleas. Each of the other cases cited by Salemo's counsel to support the proposition that the Government must fulfill its promises, notwithstanding a defendant's material breach, involved a breach of an

agreement by the Government. In *United States v. Shapiro,* 879 F.2d 468 (9th Cir. 1989), we held that the Government's breach of its stipulated agreement with the defendant that it would not put on evidence of prior arrests compelled reversal. *Id.* at 472. In *United States v. Myers,* 32 F.3d 411 (9th Cir.1994), we reversed because the Government breached its agreement to recommend a sentence at the low end of the Sentencing Guidelines range. *Id.* at 413. In *United States v. De la Fuente;* 8 F.3d 1333 (9th Cir.1993), we held that the Government's breach of its agreement to disclose the defendant's cooperation to the sentencing judge provided grounds for resentencing. *Id.* at 1341.

Here, Salemo breached the plea agreement. Salemo's counsel has not cited, nor have we discovered, any principle of contract law that would require the Government to perform its obligations pursuant to a plea agreement, following a breach of the agreement by the defendant, and a trial on the merits on all counts. The district court did not err in disregarding the terms of the plea agreement in imposing sentence on January 6, 1995.

## IV

Salemo's counsel argues that the district court violated the Double Jeopardy Clause by considering subsequent uncharged crimes Salemo committed in Pennsylvania in fixing the sentence in this matter. We review *de novo* a contention that a district court violated the Double Jeopardy Clause. *United States v. Wolfswinkel,* 44 F.3d 782, 784 (9th Cir.1995).

Salemo's counsel relies on *United States v. McCormick,* 992 F.2d 437 (2nd Cir.1993), and *United States v. Koonce,* 945 F.2d 1145 (10th Cir.1991), *cert. denied,* 503 U.S. 998, 112 S.Ct. 1705, 118 L.Ed.2d 413 (1992), to support his argument that the Double Jeopardy Clause prevents a second punishment for uncharged conduct previously considered by a court in imposing punishment in a prior prosecution. After Salemo's counsel filed the opening brief in this matter, the Supreme Court published its opinion in *Witte v. United States,* ─── U.S. ───, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995). In *Witte,* the Supreme Court rejected the rationale employed by the authors of the *McCormick* and *Koonce* decisions. The Court held that consideration of uncharged conduct in arriving at a sentence "within the statutorily authorized punishment range" does not constitute punishment for the prior acts. *Id.* at ───, 115 S.Ct. at 2205. "[A] defendant in that situation is punished for double jeopardy purposes, only for the offense of which the defendant is convicted." *Id.*

In his response to this court's request for a supplemental brief on the applicability of *Witte* to this matter, Salemo's counsel argues that *Witte* only applies to a sentence that does not exceed the "legislatively authorized guideline range." The Court rejected this notion in *Witte* with the following words:

> By including the cocaine from the earlier transaction-and not just the marijuana involved in the offense of conviction-in the drug quantity calculation, the District Court ended up with a higher offense level (40), and a higher sentence range (292 to 365 months), than it would have otherwise under the applicable Guideline, which specifies different base offense levels depending on the quantity of drugs involved. USSG § 2D1.1. This higher guideline range, however, still falls within the scope of the legislatively authorized penalty (5–40 years). As in *Williams* [*v. Oklahoma,* 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959)], the uncharged criminal conduct was used to enhance petitioner's sentence within the range authorized by statute. If use of the murder to justify the death sentence for the kidnaping conviction was not "punishment" for the murder in *Williams,* it is impossible to conclude that taking account of petitioner's plans to import cocaine in fixing the sentence for the marijuana conviction constituted "punishment" for the cocaine offenses.

*Id.* at ───, 115 S.Ct. at 2206.

The district court did not violate the Double Jeopardy Clause in considering the uncharged Pennsylvania crimes in departing upward from the applicable guideline range because the punishment it imposed did not

exceed the maximum penalty authorized by Congress.

## V

■ Salemo's counsel asserts that the Arizona district court should not have imposed a sentence consecutive to the unexpired term imposed by the Eastern District of Pennsylvania because fraud is a "groupable offense under [U.S.S.G.] § 3D1.1." This issue has become moot since the filing of the notice of appeal. On July 26, 1995, the Third Circuit vacated the judgment in Salemo's Pennsylvania matter and remanded it for resentencing. *United States v. Salemo*, 61 F.3d 214 (3rd Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 546, 133 L.Ed.2d 449 (1995). Accordingly, the portion of the district court's sentence that directs that Salemo's sentence must be served consecutively to his Pennsylvania sentence must be stricken from the judgment.

## VI

■ Salemo's counsel asserts that the district court clearly erred in finding that the loss that Salemo intended to inflict was in excess of five million dollars. The court used this calculation in assessing an eleven point increase in the offense level pursuant to U.S.S.G. § 2F1.1(b)(1)(L). We review a district court's factual determination in applying the sentencing guidelines for clear error. *United States v. Redman*, 35 F.3d 437, 438 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 922, 130 L.Ed.2d 802 (1995).

The record shows that Salemo applied for bank loans totaling more than five million dollars using a false social security account number, and submitted statements that falsely represented his ability to repay his debts. Salemo's counsel argues that the evidence, as summarized by Judge Rosenblatt, shows that Salemo did not intend that all of his loan applications be approved. He relies on the following comments by the court:

5. Section 2X1.1 provides in pertinent part:
   (b) Specific Offense Characteristics
      (1) If an attempt or solicitation, decrease by 3 levels, unless the defendant completed all the acts the defendant believed necessary for

[T]he whole modus operandi ... suggests that this was indeed Mr. Salemo's M.O., that he would apply for loans all over the board with the hope that one or more of them would somehow slip through the cracks,.... If you throw enough applications on the wall, sooner or later someone by mistake or otherwise permits the fraudulent activity to be consummated.

We construe the court's observation as an indication that it was persuaded that Salemo intended to defraud each of his victims, but that he was aware that despite his fraudulent representations his loan applications could be rejected by some of them. It is undisputed that Salemo was penniless and had no intention of repaying the loans. The court did not clearly err in finding that Salemo intended to defraud his victims of a sum in excess of five million dollars. *See* U.S.S.G. § 2F1.1, Application Note 7 (1988) ("if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss.")

## VII

■ Salemo's counsel maintains that the district court erred in declining to decrease his offense level by three points pursuant to U.S.S.G. § 2X1.1 (1988) of the sentencing guidelines.[5] Salemo's counsel argues that section 2X1.1 is applicable pursuant to Application Note 7 and Application Note 9 to section 2F1.1. Application Note 7 and Application Note 9 were not incorporated into section 2F1.1 until 1991. At the suggestion of the Government, the district court applied the guidelines in effect on the date the crime was committed in this appeal. Salemo's counsel did not object. He does not challenge this ruling. Sentencing guideline section 1B1.11(b)(2) (1994) provides as follows:

The Guidelines Manual in effect on a particular date shall be applied in its entirety. The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline

successful completion of the offense or the circumstances demonstrate that defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control.

section from a different edition of the Guidelines Manual.

*See United States v. Warren*, 980 F.2d 1300, 1306 (9th Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 397, 126 L.Ed.2d 344 (1993) ("we think it more appropriate that sentences be determined under one set of Guidelines rather than applying the Guidelines piecemeal.")

In *United States v. Van Boom*, 961 F.2d 145 (9th Cir.1992), we held that "attempts are to be punished as if they had succeeded." *Id.* at 147. The district court did not err in denying his request to decrease his offense level pursuant to section 2X1.1. Section 2F1.1 does not require a court to apply section 2X1.1 under these circumstances.[6]

## VIII

■■■ Salemo asserts that the district court was collaterally estopped from making an upward departure because the trial judge, Chief Judge Edward N. Cahn, of the District Court for the Eastern District of Pennsylvania, refused to do so. We review *de novo* the applicability of the collateral estoppel doctrine. *United States v. Seley*, 957 F.2d 717, 720 (9th Cir.1992). The doctrine of collateral estoppel did not prohibit Judge Rosenblatt from considering the question whether an upward departure was warranted.

■■■ Collateral estoppel applies only where the parties in the prior proceeding had an opportunity to litigate fully and fairly the ultimate facts sought to be asserted in the second proceeding. *United States v. Bernhardt*, 840 F.2d 1441, 1449 (9th Cir.), *cert. denied sub nom. McCarthy v. United States*, 488 U.S. 954, 109 S.Ct. 389, 102 L.Ed.2d 379 (1988). The inability of a party to appeal from an adverse determination in the prior proceeding is a major factor to be considered. *Standefer v. United States*, 447 U.S. 10, 22–24, 100 S.Ct. 1999, 2007–08, 64 L.Ed.2d 689 (1980). Because the Government could not appeal from Judge Cahn's discretionary refusal to depart upward, *United States v. Evans*, 49 F.3d 109, 111 (3rd Cir.1995), the doctrine's requirement of an incentive to litigate fully is not present in this case. Moreover, Chief Judge Cahn did not make any adverse "ultimate fact" determinations in his discretionary refusal to make an upward departure. *See Seley*, 957 F.2d at 720–22 (holding that collateral estoppel precludes future litigation between the same parties of ultimate facts that have been determined by valid and final judgments). The district court did not violate the doctrine of collateral estoppel by departing upward from the Sentencing Guidelines range.

## CONCLUSION

We hold that section 3006A does not authorize a district court to compensate an attorney who serves as advisory counsel at the defendant's request. The district court was not required to follow the terms of the plea agreement after this matter had been remanded because the agreement, by its own terms, did not survive the setting aside of Salemo's plea of guilty by this court. A sentence that reflects uncharged conduct does not violate the Double Jeopardy Clause if it is within the statutorily authorized punishment range. In determining the amount of loss, a court may consider the amount of loss the defendant intended to inflict on his victim. The doctrine of collateral estoppel is inapplicable under the circumstances of this case.

The judgment of conviction is AFFIRMED. The appeal from that portion of the sentence that ordered that the period of imprisonment must be served consecutively is DISMISSED as moot. The district court is directed to amend the judgment by striking the words "[t]hese sentences shall run consecutive to sentence imposed in U.S. District Court, Philadelphia, PA, CR 92–547." In all other respects, the district court's sentencing decision is AFFIRMED.

---

6. Section 2F1.1 provides in pertinent part:

  (b) Specific Offense Characteristics
    (1) If the loss exceeded $2,000, increase the offense level as follows:

| *Loss* | *Increase in Level* |
|---|---|
| . . . . | |
| (L) over $5,000,000 | add **11** |