**UNITED STATES, Appellee,**

v.

**Edward C. KELLEY, Defendant, Appellant.**

**No. 95–1658.**

United States Court of Appeals, First Circuit.

Heard Dec. 5, 1995.

Decided Feb. 20, 1996.

Edward C. Roy, Providence, RI, by Appointment of the Court, with whom Roy & Cook, was on brief, for appellant.

Margaret E. Curran, Assistant United States Attorney, with whom Sheldon Whitehouse, United States Attorney, and Charles A. Tamuleviz, Providence, RI, were on brief, for appellee.

Before TORRUELLA, Chief Judge, CYR, Circuit Judge, and SKINNER,* Senior District Judge.

SKINNER, Senior District Judge.

Defendant-appellant Edward Kelley was charged in a six count indictment of mail fraud in violation of 18 U.S.C. § 1341 and making false statements to a federal agency in violation of 18 U.S.C. § 1001. Pursuant to a guilty plea on the three mail fraud counts, Kelley was sentenced to 21 months incarceration, followed by three years supervised release. On appeal of his sentence, Kelley argues (1) that the district court erred in determining the amount of the loss for sentencing purposes, and (2) that the district court abused his discretion in denying a two point offense level reduction for acceptance of responsibility. We affirm.

## I. BACKGROUND

### A. Facts

This prosecution arose out of Edward Kelley's efforts to enlist the assistance of the Small Business Administration ("S.B.A.") in refinancing his commercial lobster boat, the "Alter Ego II." Kelley purchased the boat in June 1992 for $5,000 in cash and a $22,000 promissory note, and quickly sold a 45% interest to his brother Robert Fletcher for $20,000. The vessel sustained substantial damage during a severe storm in December 1992.

Kelley applied for disaster relief from the S.B.A., in the course of which he submitted a Personal Finance Statement stating that the vessel purchase price was $60,000, rather than $27,000, and that he had paid cash in full without incurring any debt. Both of these averments were false.

Based on this application, the S.B.A. agreed to loan Kelley $55,100, secured by a mortgage on the vessel and a third mortgage on Kelley's house. After an initial disbursement of $10,000 in April 1993, Kelley submitted a Progress Certification Report indicating that he had purchased lobster traps from Robert Fletcher's R.A.F. Lobster Company for $32,000. This statement was also false. After the S.B.A. disbursed the balance of the loan, Kelley used approximately $15,000 of the S.B.A. funds for personal expenses. After a total of $864 in repayments over three months, the loan went into default. Kelley was subsequently indicted on the basis of the false statements contained in his Personal Finance Statement and his Progress Certification Report, and pled guilty to three counts of mail fraud.

### B. The Sentencing Proceeding

At the sentencing proceeding, the government argued that Kelley's total offense level should be fifteen, representing eleven points for fraud involving more than $40,000 under U.S.S.G. § 2F1.1(b)(1)(F), increased by two points for "more than minimal planning" under U.S.S.G. § 2F1.1(b)(2)(A), and augmented by an additional two points for obstruction of justice under U.S.S.G. § 3C1.1. In support of the obstruction points, the government cited two attestations Kelley made in completing his presentence report submission to the probation office, namely (1) that he had nothing to do with the theft of navigational equipment from the Alter Ego, and (2)

_____
* Of the District of Massachusetts, sitting by designation.

that he used all disbursed funds to try to keep the Alter Ego afloat.

At the sentencing proceeding, Kelley contested the government's calculated offense level, contending that the government overvalued the loss in light of the S.B.A.'s failure to pursue civil remedies. Kelley also argued that his submission to the probation department did not obstruct justice.

After hearing testimony from eight witnesses, the sentencing court rejected the S.B.A.'s valuation of its loss at $54,236. Specifically, the sentencing court rejected the testimony of an S.B.A. witness who appraised the value of the vessel at $5,000. The court implicitly adopted the testimony of Kelley's expert marine surveyor, Steven Mainella, who testified that the vessel was worth between $18,000 and $25,000. The defendant did not, however, attempt to rebut the testimony of an S.B.A. loan officer as to the potential recovery from Kelley's house. Consequently, the only evidence before the sentencing court on the value of the house was that a foreclosure proceeding would fetch an estimated $104,000, which after satisfying $95,000 in superior mortgages and auction expenses would produce a negligible recovery.

The court concluded that the S.B.A.'s loss was between $20,000 and $40,000, resulting in an offense level of ten. Finding that the S.B.A. had failed to pursue pledged collateral, the sentencing court denied restitution. The court added two points for more than minimal planning, and two more for obstruction of justice; it concluded that his criminal history category was one. Accordingly, Kelley was sentenced to 21 months imprisonment, followed by three years supervised release, which was within the guideline range.

## II. *ANALYSIS*

### A. Calculation of the S.B.A.'s Loss

■ Kelley argues that the district court's conclusion that the S.B.A.'s loss ranged between $20,000 and $40,000 was clearly erroneous in light of evidence adduced at trial. Under the Sentencing Guidelines, crimes involving fraud are uniformly assessed a base offense level of six. *See* U.S.S.G. § 2F1.1(a). This base offense level is increased in proportion to the magnitude of the loss if the victim's loss exceeded $2,000. *See* U.S.S.G. § 2F1.1(b)(1). The commentary to the Guidelines provides a set of formulae to apply in determining the amount of the loss in particular circumstances. For example, the commentary instructs that to calculate the loss in a fraudulent loan application, the sentencing court starts by taking "the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan." *See* U.S.S.G § 2F1.1, comment. (n. 7(b)). This formula is binding in cases involving the procurement of fraudulent loans and is clearly applicable to Kelley's misconduct. *See United States v. Bennett,* 37 F.3d 687, 695 (1st Cir.1994); *see also Stinson v. United States,* 508 U.S. 36, 37–38, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").

■ Kelley challenges the court's findings as to the value of the mortgage and the vessel. A sentencing court's valuation of loss is subject to the "clearly erroneous" standard of review. *See, e.g., United States v. Brandon,* 17 F.3d 409, 457 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 80, 81, 130 L.Ed.2d 34 (1994). Although the Guidelines suggest that a rather specific formula should be applied in this case, the Sentencing Commission has recognized that it may be difficult to calculate a specific loss with any degree of precision. Precise loss may be hard to determine where the value of collateral is in dispute, either because the victim has not exercised rights against the collateral, or it is alleged that such efforts did not bring a fair market price. *Cf. United States v. Chorney,* 63 F.3d 78, 82 (1st Cir.1995) (rejecting defendant's argument that he had been denied sufficient opportunity to establish fair market value of unpledged assets). In light of potential difficulties in calculating the loss, the

sentencing court "need only make a reasonable estimate of the loss, given the available information." *See* U.S.S.G. § 2F1.1, comment (n. 8).

With respect to the Alter Ego, the district judge rejected the government witness' testimony that the vessel had a value of $5,000, implicitly adopting Steven Mainella's appraisal of $18,000 to $25,000. Neither party contests use of this figure on appeal.

With respect to the house, the parties agree that the property was appraised at $130,000 and subject to two superior mortgages totalling $95,000. At the sentencing hearing, the S.B.A. loan officer testified that it was standard practice in the banking industry to value property to be liquidated at auction at 80% of appraisal value, or $104,000 for Kelley's house. The S.B.A. loan officer further testified that this liquidation value would be further offset by the $95,000 in prior mortgages, and by the estimated $5,000 to $8,000 in auction expenses. Foreclosure on Kelley's house would thus yield a net return of $1,000 to $4,000. Kelley did not offer testimony at the sentencing hearing to dispute this accounting, nor does he attempt to factually undermine its premises on appeal.

Kelley does make the suggestion that the S.B.A.'s accounting method is wrong as a matter of law. Specifically, Kelley argues that the sentencing court must accept the value of the collateral to the defendant, rather than the victim lending institution, and that he should be credited for the full $35,000 in equity he could have obtained if he sold the house on the open market. But the commentary to the Guidelines specifies that valuation of collateral is the amount the "lending institution" could expect to receive from pursuing a security interest. *See* U.S.S.G. § 2F1.1, comment. (n. 7(b)). The express reference in the Guidelines to the mortgagee rather than the mortgagor precludes Kelley's argument. The value of the loss is to be offset by the amount the lender could expect to recover from pursuit of pledged collateral. Consequently, the $1,000 to $4,000 expected recovery is the proper measure of the value of the house.

To summarize, the evidence before the sentencing court demonstrated that if the S.B.A. had pursued civil remedies against the house and the boat, it could have recouped between $19,000 and $29,000. Deducting this amount from the $54,236 outstanding loan balance, the S.B.A.'s loss was somewhere between $24,000 and $35,000. This range is well within the range of loss found by the court.

Kelley makes a final argument that it was inconsistent for the sentencing court to deny restitution, while valuing the S.B.A.'s loss as greater than $20,000. Although Kelley properly points out that the authority of a sentencing court "to decline to order restitution is limited," the commentary to the Sentencing Guidelines suggests there are several factors a court may consider in declining to order restitution. *See* U.S.S.G. § 5E1.1, comment. (backg'd). Prominent among these factors are the lack of victim's need, uncertainty in calculating the amount of restitution, and fairness to the victim. *See also* 18 U.S.C. § 3664(a). The judge went on at some length in explaining his reasons for denying restitution, specifically finding that because the S.B.A. failed to avail itself of civil remedies, it was both difficult to ascertain the proper amount of restitution and fair to deny all restitution.[1] Kelley erroneously argues that an absolute denial of restitution necessarily implies the conclusion that the S.B.A. had no loss. There is no logical reason to make such a leap.

### B. Obstruction of Justice

Kelley also challenges his two point enhancement for obstruction of justice. Under the Sentencing Guidelines, the provision of a materially false statement to a probation officer during the preparation of a presentence report constitutes obstruction of justice. *See* U.S.S.G. § 3C1.1, comment (n. 3(h)). The sentencing court found that the following two passages of the signed statement which the defendant filed with the probation department were materially false:

---

**1.** The government has not filed a cross-appeal to challenge these findings.

In addition, I hoped to upgrade the boat with the proceeds of the loan. Some time after the gear was lost at sea, all of the electronic equipment on the boat was stolen by my son. As a result of this theft, which I had absolutely nothing to do with, the boat was inoperable. The boat could not generate any income.

At the time of the application, I was in a very difficult financial situation and I was desperate to get the boat back working. I used all of the funds that I received to pay for boat related expenses.

A sentencing court's finding of material falseness will be overturned only where clearly erroneous. *See, e.g., United States v. Tracy,* 36 F.3d 199, 202 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 609, 130 L.Ed.2d 518 (1994).

■  Although Kelley argues that the sentencing court erred in failing to evaluate all testimony used to support a finding of falseness "in a light most favorable to the defendant," this interpretative principle only applies to the construction of allegedly perjurious language, not to the determination of credibility of fact witnesses. *See* U.S.S.G. § 3C1.1, comment. (n. 1.). Furthermore, lenitive interpretations only apply "to the extent that an innocent reading may be plausible." *See Tracy,* 36 F.3d at 204.

■  Although Kelley argues that neither of his statements was false, there was ample evidence before the sentencing court to support its findings. Kelley's claim that he had nothing to do with theft of electronic equipment from the Alter Ego was discredited by the testimony of his son. Mark Kelley testified that his father asked him to temporarily remove equipment from the Ego in order to support a fraudulent insurance claim. Similarly, Kelley's claim that S.B.A. funds were uniformly dedicated to boat expenses was contradicted by bank records and cancelled checks indicating almost $15,600 of the S.B.A. loan was used for mortgage payments, parochial school tuition, and miscellaneous household expenses. In view of this evidence, the defendant's statements were not susceptible to an innocent interpretation. The sentencing court was warranted in finding that both statements were false.

■  Kelley also suggests that neither of these statements was material. The materiality requirement for an allegedly false statement "is not a stringent one." *United States v. Ovalle–Márquez,* 36 F.3d 212, 226 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1322, 131 L.Ed.2d 202 (1995). Under the Sentencing Guidelines, a statement is material which, "if believed, would tend to influence or affect the issue under determination." *See* U.S.S.G. § 3C1.1, comment. (n. 5). Materiality does not require a factual nexus with the underlying criminal conduct. Rather, for the purposes of a sentencing determination, materiality involves some attestation that could influence the court's sentencing discretion, including (but not limited to) determination of a period of incarceration, conditions of supervised release, or whether restitution is awarded. For example, this court has held that lying about citizenship in a submission to the probation department was material because of a particular district judge's policy to suspend supervised release in order to facilitate the deportation of illegal aliens. *See United States v. Biyaga,* 9 F.3d 204, 205 (1st Cir.1993). A false statement may be material even "if the falsehood is designed to mitigate significantly the wrongful conduct and so affect the court's exercise of discretion in choosing a sentence within the range." *See United States v. Agoro,* 996 F.2d 1288, 1292 (1st Cir.1993).

The making of false statements in the probation submission is similar enough to the underlying charged conduct (making false statements to a governmental entity) to establish a close nexus. Furthermore, both of the statements (if believed) could have impacted the decisions of the sentencing court. Kelley's denial of knowledge about the theft and its insurance implications could have swayed the determination that Kelley had exhibited "more than minimal planning" under U.S.S.G. § 2F1.1(b)(2) or that Kelley had a role as an "organizer" under U.S.S.G. § 3B1.1. Similarly, Kelley's statements about the expenditure of the proceeds of the S.B.A. loan could have affected the sentencing court's decision on restitution or minimal planning. Moreover, the suggestion that the default was the result of Kelley's "despera-

tion" constituted an attempt to evoke sympathetic mitigation from the sentencing court. *See Agoro,* 996 F.2d at 1292. As each of these potential impacts would independently satisfy the materiality requirement, the findings of the sentencing court were free of error.

### III. *CONCLUSION*

For the foregoing reasons, the sentence is *affirmed.*