USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ Nos. 96-1775 97-1400 UNITED STATES, Appellee, v. MARK O. HENRY, Defendant - Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Paul J. Barbadoro, U.S. District Judge] ___________________ ____________________ Before Selya and Boudin, Circuit Judges, ______________ and Dowd, Jr.,* Senior District Judge. _____________________ _____________________ Bjorn Lange, Assistant Federal Public Defender, Federal ___________ Defender Office, for appellant. Jeffrey C. Dobbins, Attorney, Department of Justice, with ___________________ whom Lois J. Schiffer, Assistant Attorney General, Environment _________________ and Natural Resources Division, Stephen R. Herm, Jeremy F. _________________ __________ Korzenik and David C. Shilton, Attorneys, Department of Justice, ________ ________________ were on brief for appellee. ____________________ February 5, 1998 ____________________ AMENDED OPINION ____________________  ____________________ * Of the Northern District of Ohio, sitting by designation. DOWD, Senior District Judge.  DOWD, Senior District Judge. _____________________ I. INTRODUCTION I. INTRODUCTION The defendant-appellant Mark O. Henry (hereafter "Henry") prosecutes two appeals growing out of his indictment and conviction for one count of conspiracy to violate 42 U.S.C.  6928(d)(l) which prohibits the transport of hazardous waste to a facility that does not have a permit to receive such waste, one count of mail fraud and three counts of wire fraud. Henry owned and operated Cash Energy, a corporation with offices in North Andover, Massachusetts. Cash Energy operated numerous affiliated businesses, including Beede Waste Oil ("Beede"), located primarily at Kelly Road in Plaistow, New Hampshire. Henry directed the affairs of both Cash Energy and Beede. Robert LaFlamme, an indicted co-conspirator who testified against Henry, managed Beede and oversaw its day-to-day operations. Beede applied to the New Hampshire Department of Environmental Services ("NHDES") in March 1990 for a permit to recycle virgin petroleum contaminated soil into cold mix asphalt. Virgin petroleum contaminated soil is soil contaminated with petroleum or petroleum products, petroleum sludge, and all liquid petroleum derived hydrocarbons, such as lubricating oil, heating oil, gasoline, kerosene, and diesel fuel. However, the definition excludes soil that is determined to be hazardous waste because it is contaminated with other chemicals or metals. Beede needed an NHDES permit because the recycling process emits air -2- pollutants. The recycling process required the use of a "pug mill" to mix contaminated soil with gravel and asphalt emulsion. Beede eventually obtained the permit in July. However, the permit capped the amount of contaminated soil that could be stored at the site at 3,000 tons. Beede entered into recycling contracts with several entities even before the permit was issued. Although the company sporadically recycled soil using a leased pug mill, the amount of contaminated soil stored at the site soon exceeded the permitted amount. Eventually, the amount of unrecycled soil grew to as much as 19,000 tons and at no time after May 1990 did Beede ever have less than 3,000 tons of soil at the site. By April 1991, Beede's failure to comply with the permit caused the New Hampshire Air Resources Division to issue an administrative order prohibiting Beede from accepting any more contaminated soil. This order was superseded by a new permit issued in June 1991 that allowed Beede to begin receiving new soil only if it first recycled all of the soil that had accumulated at the site. Although Beede engaged in a small amount of soil recycling after the June 1991 permit was issued, it continued to receive new contaminated soil at the site in violation of the permit terms. The mail and wire fraud counts charged that Henry participated in a scheme to defraud several of Beede's customers of money by falsely representing that Beede could lawfully receive and recycle the customers' virgin petroleum contaminated soil. The conspiracy count charged that Henry participated in a -3- conspiracy to knowingly cause hazardous waste to be transported to a facility that was not permitted to receive such waste in violation of 42 U.S.C. 6928(d)(1). The conspiracy charge involved three overt acts.1 The grand jury returned a 17 count indictment against Henry and LaFlamme on March 2, 1995 charging conspiracy, mail fraud and wire fraud. Later, on January 5, 1996 a superceding indictment was returned limiting the counts to a single count of conspiracy, six counts of mail fraud and three counts of wire fraud. LaFlamme pleaded guilty to one count of mail fraud and the conspiracy count and subsequently testified for the government at Henry's trial which was held over an eight day span in February of 1996. The first appeal challenges his convictions and the resulting 37 month sentence; the second appeal contends that the district court should not have denied his motion for a new trial based on newly discovered evidence. For the reasons that follow we affirm the convictions and sentence and the denial of Henry's motion for a new trial. II. THE CHALLENGED CONSPIRACY CONVICTION II. THE CHALLENGED CONSPIRACY CONVICTION A. The Challenged Jury Instructions on the Conspiracy Count.  ____________________ 1 Two of the overt acts charged that in the spring of 1991 Henry, after receiving laboratory data showing contamination of the soils, either by cadmium or iron, caused the soils to be transported to Beede. One shipment of 243 tons came from a site in Lawrence, Massachusetts and the other shipment of 250 tons came from the Portsmouth Naval Shipyard in Kittery, Maine. -4- The conspiracy count, charged under 18 U.S.C. 371, alleged that Henry and LaFlamme conspired knowingly to transport and cause to be transported hazardous waste to a facility that did not have interim status and a permit to accept hazardous waste in violation of 42 U.S.C. 6928 (d)(l).2 The indictment defined hazardous waste by reference to the substances and materials listed or identified in Title 40, Code of Federal Regulations, Part 261 and further alleged that under the regulation, "any waste containing concentrations of lead in excess of 5 parts per million or cadmium in excess of l part per million using appropriate test methods is a hazardous waste." The jury instructions relative to the conspiracy charge defined the offense of causing hazardous wastes to be transported to an unpermitted facility as requiring the following elements:  ____________________ 2 Section 6928(d)(l) provides: (d) Criminal penalties (d) Criminal penalties Any person who-- (1) knowingly transports or causes to be transported any hazardous waste identified or listed under this subchapter to a facility which does not have a permit under this subchapter, . . .  . . . . shall, upon conviction, be subject to a fine of not more than $50,000 for each day of violation, or imprisonment not to exceed two years (five years in the case of a violation of paragraph (1) or (2)), or both. . . . -5- First, that the defendant transported or caused to be transported hazardous waste to a facility that was not authorized to receive such waste; and  Second, that the defendant knew that the material transported was hazardous and that the facility that received the waste was not authorized to receive such waste. Then, over the defendant's timely objection, the court defined hazardous waste as follows: Solid waste qualifies as hazardous waste if __ using the toxicity characteristic leaching _____________________________________________ procedure, TCLP, extract from a __________________ representative sample of the solid waste contains lead in concentrations greater than five parts per million or cadmium in concentrations greater than one part per million. (Emphasis added).  The appellant couples the challenge to the definition of hazardous waste with the claim that the trial court improperly participated in the direct examination of the government witness Michael Wimsatt, a regulatory inspector with NHDES in the hazardous waste program. First, we observe that the court's definitional instruction as to what constitutes hazardous waste was correct as a matter of law. The government bears the burden of establishing that the defendant knew that the materials transported ____ constituted hazardous waste. The Congress has delegated to the Administrator of the EPA the responsibility for listing the types and characteristics of substances considered to be hazardous wastes. 42 U.S.C. 6921(b). The ensuing regulation, found at 40 C.F.R. 261.3, provides that soil is a hazardous waste if it -6- "exhibits any of the characteristics of hazardous waste identified in Subpart C." Subpart C includes the characteristic of "toxicity". 40 C.F.R. 261.24 introduces the Toxicity Characteristic Leaching Procedure (TCLP) as a means of testing for toxicity and provides that when this testing procedure shows that the waste contains any of the contaminants listed in table l at a concentration equal to or greater than the respective value given in the table, then the waste, by definition, constitutes hazardous waste. The table located at 40 C.F.R. 261.24(a) dictates that the regulatory limit for lead is 5 mg/L (or 5 parts per million) and the corresponding regulatory limit for cadmium is l mg/L (or l part per million).  In the conference conducted by the district court prior to finalizing the jury instructions, counsel for the defendant argued that it should be left for the jury to determine if soils shipped contained hazardous waste without the benefit of the challenged definition. Defendant's counsel also disputed the delegation by the Congress to the EPA Director to promulgate regulations defining hazardous wastes and argued that because there had been changes in those regulations as to what constituted levels of toxicity, that an individual such as the defendant should not suffer criminal liability in such a setting. Defendant's argument is grounded in the nondelegation doctrine, which provides that Congress may not delegate its legislative power to another branch of the government. See U.S. Const. art. ___ -7- I, 1 ("All legislative powers herein granted shall be vested in a Congress of the United States."). The district court responded to the improper delegation argument by reliance on Touby v. United States, 500 U.S. 160, 165 _____ _____________ (1991), for the proposition that the delegation of legislative power to another branch of the government is permissible as long as Congress sets forth an "intelligible principle" to which the executive or judicial branch must conform. In Touby, the Supreme _____ Court upheld Congress' delegation of the power to define criminal conduct to the Attorney General as constitutionally permissible. The Court held that "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors. So long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" Touby, supra, at 165, quoting _____ _____ J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409, 48 ________________________ ______________ S. Ct. 38, 352, 72 L.Ed. 624 (1928). The Touby Court then upheld the Controlled Substances _____ Act at issue in that case on the ground that Congress had in fact set forth an "intelligible principle" which meaningfully constrained the Attorney General's discretion to define criminal conduct. The Court discussed several factors that rendered the statute constitutional: (1) requiring the Attorney General to determine that the expedited procedure is "necessary to avoid an -8- imminent hazard to the public safety," (2) specifying the factors that the Attorney General must consider in making such a determination; and (3) requiring publication of a 30-day notice of the proposed scheduling and consideration of any comments from the Secretary of Health and Human Services. Touby, supra, at 166. _____ _____ We approve the district court's reliance on Touby in _____ the instant case, and hold that the delegation by Congress to the EPA of the legislative authority to define hazardous waste was permissible given the fact that there existed several constraints upon the EPA's exercise of this authority that are similar to the constraints found to be determinative of constitutionality in Touby. First of all, we note that the Resource Conservation and _____ Recovery Act sets forth a detailed procedure with which the EPA must comply before it may exercise this legislative power and list the types and characteristics of hazardous waste. Specifically, 42 U.S.C. 6921(a) requires the EPA to first provide notice and the opportunity for public hearing on the issue of what precisely are the characteristics of "hazardous waste," and further requires the EPA to consult with "appropriate Federal and State agencies" on this definitional issue. See ___ Touby, supra, at 166 (delegation of legislative power to _____ _____ executive constitutional in part due to requirement that executive consider comments from other authorities). Secondly, in addition to requiring the EPA to comply with these procedural steps, the statute specifies certain factors that the EPA must consider in developing the criteria: -9- "the Administrator shall. . . develop and promulgate criteria for identifying the characteristics of hazardous waste, . . . taking into account toxicity, persistence, and degradability in nature, potential for accumulation in tissue, and other related factors such as flammability, corrosiveness, and other hazardous characteristics." 42 U.S.C. 6921(a). See Touby, supra, at 166 ___ _____ _____ (holding specification of three factors that the executive is "required to consider" constrains executive's legislative power and renders delegation constitutional). Furthermore, besides this detailed process for establishing the criteria to be used in identifying hazardous waste, the statute also constrains the EPA's discretion by listing specific characteristics which the statute directs "shall be subject to the provisions of this subchapter solely because of the presence in such wastes of certain constituents (such as identified carcinogens, mutagens, or teratagens) at levels in excess of levels which endanger human health." 42 U.S.C.  6921(b)(1). In sum, we find no fault with the challenged definition. In fact, the district court in this case was sensitive to the knowledge component of the government's proof and the defendant's contention that he believed the soils in question did not constitute hazardous waste, and therefore instructed the jury on a good faith defense.3  ____________________ 3 The jury was instructed as to the defense of good faith with respect to the conspiracy count as follows: -10- B. The Questioning of Wimsatt by the District Court. The defendant combined his objection to the definition with an objection to the court's questioning of Michael Wimsatt, a regulatory inspector with the NHDES in its hazardous waste program. The court engaged in the following colloquy with Wimsatt that featured the toxicity characteristic leaching procedure: THE COURT: And the TCLP test uses water as the [leachate], right? WIMSATT: It's a water solution. It has some acid in it, obviously, and it has whatever contaminants, but it's still relatively dilute and it's essentially a water solution, that's right. THE COURT: Is it fair to say, then, with a TCLP test, something expressed as five milligrams per liter, could also be expressed as five parts per million? WIMSATT: Yes, that's correct, that's right. So we have a limit set under TCLP that says when you get an extract from our sample, it can't have more than five parts per million of lead in it, and if it does, it's going to be considered a hazardous waste.    ____________________ If the defendant had a good faith belief that Beede was authorized to transport the waste to its facility, he is not guilty of the crime of conspiracy even if it turns out that that belief was wrong. The burden of proving good faith does not rest with the defendant because the defendant does not have an obligation to prove anything in this case. It is the government's burden to prove beyond a reasonable doubt that the defendant is guilty of conspiracy.  -11- The defendant's counsel first objected to the above questioning of Wimsatt during the jury charge conference, and when asked by the court what remedy did counsel propose, the response was to delete the hazardous waste definitional paragraph from the jury charge. The district judge declined, properly we hold, and observed that he had the authority pursuant to Evidence Rule 614 (b)4 to question witnesses and had done so to assist the jurors. Specifically, the district court opined: THE COURT: All right. I decline to do that for the reasons that I've outlined. Let me just note I think this issue of questioning of witnesses by the Court is a very important and - important matter that has to be handled carefully by the Court. Clearly, Rule 614(b) allows the Court to question witnesses. In a trial like this where I think much of the evidence has been confusing and concerns technical matters, terms that involve jargon, I think it is important where counsel does not ask questions clearly for the Court to clarify undefined terms, and therefore I have asked questions during the trial to that end. I think it's also important for me since - in order to protect the defendant's rights, that I understand the import of something that is being testified to. The jury has to make findings of fact here ultimately in deciding the defendant's guilt or innocence, but I have to pass on motions that deal with evidentiary sufficiency; such as, Rule 29 motions. If I don't understand a particular point of testimony, I can't do my job with respect to a Rule 29 motion. So I feel it's important for me to ask questions when I don't understand some testimony and when the jury may potentially not understand testimony. I  ____________________ 4 This rule states that "[t]he court may interrogate witnesses, whether called by itself or by a party." Fed. R. Evid. 614(b). -12- try to do it as little as possible, and I try my best not in any way to indicate in any sense that I'm taking sides. I also have in my jury instructions an instruction to the jury that they should not give any greater weight to the testimony of a witness in answer to my questions simply because the questions have come from me, and I have reiterated for the jury the fact that I am neutral, impartial and doesn't - don't have a stake in this case, and I don't believe that I've in any way adversely affected the defendant's right to a fair trial here by my questions. So I think the premise of your request is flawed, and I decline to grant the instruction that you propose.  Transcript of Day 8 at p. 41.  We agree with the district court that his questioning in this case was permissible. Initially, we note that the First Circuit recognizes the "well-settled" rule that the trial judge has a "perfect right" to participate in the trial and to question witnesses. United States v. Gonz lez-Soberal, 109 F.2d 64, 72 _____________ ________________ (1st Cir. 1997). The limitations placed on this right are that the judge's questioning "must be balanced; he cannot become an advocate or otherwise use his judicial powers to advantage or disadvantage a party unfairly." Logue v. Dore, 103 F.3d 1040, _____ ____ 1045 (1st Cir. 1997). "An inquiry into the judge's conduct of the trial necessarily turns on the question of whether the complaining party can show serious prejudice." Id. ___ In the instant case, our review of the transcript reveals that the judge's questioning of Wimsatt was nothing more that the sort of occasional "efforts to clarify testimony" that -13- falls squarely within the scope of the district judge's right and responsibility to manage the progress of the trial. See Logue, ___ _____ supra, at 1045. Furthermore, we hold that any possible risk of _____ prejudice to Henry as a result of the judge's questions was abated by the clear instruction to the jury that it should ignore any impression that his questions might have made on them. In conclusion, the trial transcript clearly demonstrates that the key issue on the conspiracy count was whether the defendant knew the soils constituted hazardous waste and his good faith defense was anchored in his assertion that he did not believe the soils constituted hazardous waste. We further hold that the district court's decision to define hazardous waste in the context of the indictment and the C.F.R. regulations, rather than offer no assistance to the jury on the question of what constitutes hazardous waste, as suggested by defendant's counsel, was proper, and in any event, in the setting of this case, clearly not prejudicial to the defendant. III. THE SENTENCING ISSUES III. THE SENTENCING ISSUES Two primary issues are raised. The court chose U.S.S.G. 2F1.1 as the guideline to be followed, but the defendant argued that U.S.S.G. 2Q1.2 was the better choice.5 The latter guideline governs such environmental offenses as the  ____________________ 5 Because the adjusted offense level for the conspiracy conviction was determined to be nine levels less serious than the level for the grouped fraud count, pursuant to U.S.S.G.  3D1.4(c) the conspiracy conviction did not increase the total offense level of 22 as computed under the mail and wire fraud counts.  -14- unlawful transportation of hazardous materials and the mishandling of hazardous or toxic substances. U.S.S.G. 2F1.1 deals with fraud and deceit, and the use of this guideline resulted in a higher offense level calculation. A specific offense characteristic under 2F1.1 requires a judicial calculation of the loss caused by the fraud and deceit. Henry challenges the court's calculation even though it was reduced one level by the court from the pre-sentence recommendation. The judge departed downward one offense level after he concluded that the application of the Guidelines did not "correctly capture [] the true value of the loss in this case." The defendant was then sentenced to 37 months imprisonment, which is the low end of the applicable range based on the defendant's Criminal History of I. A. Should the defendant have been sentenced under Guideline 2Q1.2 rather than 2F1.1? Appendix A to the Sentencing Guidelines Manual provides a statutory index keyed to the applicable guideline. In the introduction to Appendix A, the statement is made that "if, in an atypical case, the Guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the Guideline section most applicable to the Nature of the Offense conduct charged in the count of which the defendant was convicted." The reader is then referred to 1B1.2 of the Guidelines which states in Application Note 1 that "when a particular statute proscribes a variety of conduct that might constitute the subject of different offense guidelines, the court -15- will determine which Guideline section applies based upon the nature of the offense conduct charged in the count of which the defendant was convicted." Building on the atypical case reference and Application Note 1 to 1B1.2, Henry contends that his convictions represent an atypical fraud prosecution because the gravamen of the convicted counts, including the conspiracy, was that the defendant violated environmental rules and regulations by transporting and storing contaminated soil which exceeded permitted levels in quantity and composition at the Beede Waste Oil facility in New Hampshire.  The defendant suggests that the apparent dearth of cases involving simultaneous federal prosecution of both environmental offenses and wire and fraud counts suggests the claimed atypicality and argues that the commentary in application note 13 to U.S.S.G 2F1.1, which directs that "where the indictment...establishes an offense more aptly covered by another guideline, apply that guideline rather than 2F1.1," requires that U.S.S.G. 2Q1.2 should have been followed by the district court. The district court conducted a four hour sentencing hearing and rejected the defendant's 2Q1.2 argument, holding that the case was not about environmental crime, but rather "an effort by Mr. Henry to generate income." We review de novo the __ ____ trial court's determinations on the issue of whether to apply  2F1.1 rather than 2Q1.2. United States v. Ruiz, l05 F.3d 1492, _____________ ____ l504 (1st Cir. 1997).  -16- The defendant's reliance on United States v. Fulbright, _____________ _________ 105 F.3d 443 (9th Cir. 1996) is misplaced. In Fulbright, the _________ defendant was convicted of conspiracy to impede federal officers in violation of 18 U.S.C. 372 and for obstruction of justice under 18 U.S.C. 1503. The district court there used the only guideline listed for 18 U.S.C. in the Statutory Index to the Guidelines Manual. Citing the atypicality language in Appendix A,6 the Ninth Circuit then remanded for resentencing under U.S.S.G 2A2.4 which is captioned "Obstructing or Impeding Officers," because the defendant's conduct was determined to be more analogous to impeding a federal officer than to obstruction of justice. Id. at 453.  ___ In this case, in contrast to Fulbright, and as _________ recognized by the district court below, the defendant's conduct involved two classes of victims. With respect to the fraud counts, the victims were the companies to which Henry made promises that he never kept in exchange for the monies he extracted, while the conspiracy conviction victimized society as a whole. The decision in United States v. Rubin, 999 F.2d 194 ______________ _____ (7th Cir. 1993), tracks the single victim analysis as the victims in connection with the mail fraud and price-fixing were the same. Accepting the separate victim analysis and applying the  ____________________ 6 "If, in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, [the court should] use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. Appendix A. See also U.S.S.G. 1B1.2, comment (n.1). ________ -17- appropriate standard of review, we find no error in the determination that the principal crime came under the fraud analysis of U.S.S.G. 2F1.1. We find no fault in the district court's analysis that the main motivation for the criminal conduct was to obtain money. There is no indication that the defendant was embarked on a crusade to engage in committing environmental crimes. Rather, it is clear that his objective was to make money, and in the process he engaged in an environmental crime, which conduct was an incidental by-product of his fraudulent conduct. We therefore find no error in the application of the guidelines under the aegis of 2F1.1. B. The Loss Calculation under U.S.S.G. 2F1.1. The computation of the Offense Level under 2F1.1 requires a determination of the loss. A sliding scale has been adopted in 2F1.1(b)(1). The presentence report fixed the loss at $1,282,718, which required an addition of eleven levels. The court refused to consider the Mobil Oil soil transactions, which were the subject of count one, and deducted $740,642 from the loss figure with a resulting total loss figure of $542,076. That final calculation of the loss added ten levels to the loss. Henry suggested that the remediation costs, while exceeding $200,000 were less than the next dollar figure of $350,000 on the sliding scale, and inferentially argued that the loss addition should be computed at an increase of eight levels, rather than the ten levels fixed by the court. United States v. Kelley, 76 _____________ ______ F.3d 436, 439 (1st Cir. 1996), teaches that a sentencing court's -18- valuation of loss is subject to the clearly erroneous standard. Given the reality that some of the Beede customers may face additional costs in the remediation context, the "benefit" to the defrauded customers arising from the transportation of the soils from their sites is at best speculative. We find no fault in the ignoring of that possible benefit in the calculation. Application Note 8 to 2F1.1 teaches that the (b)(1) loss need not be determined with precision, but rather that the court need only make a reasonable estimate of the loss given the available information. Finally, we note that the district court departed downward one level due to its uncertainty as to whether the loss had been properly determined. We find no prejudicial error in ignoring the "benefit." The defendant also complains that the district court improperly shifted the burden of demonstrating the value of the services provided to the Beede customers to the defendant. In view of the fact that the district court departed one level to accommodate the "loss" issue,7 it is not necessary to address the  ____________________ 7 The district court, in granting the one-level downward departure, explained that had he accepted Henry's argument that the loss level should be reduced by the "benefit" claimed by Henry, the resulting enhancement required by U.S.S.G.  2F1.1(b)(1) would have been eight rather than ten levels. The district court further explained that had the loss level been calculated at eight levels, then the grouping rules for multiple counts, U.S.S.G. 3D1.1, et. seq., would have come into play with the consequence that the total offense level would have been reduced only one level, i.e., from 22 to 21. In recognition of the controversy over the calculation of the loss, the court then departed downward one level from the total offense level of 22 that included ten levels for the loss to a total offense level of 21. See transcript of sentencing hearing at 153-156. ___ -19- final sentencing issue raised by Henry challenging the district court's holding that the defendant had the burden of proof as to the benefit provided the defrauded victims. In any event, we see no error on these facts.  -20- IV. ALLEGED ERRORS IN THE CONDUCT OF THE TRIAL IV. ALLEGED ERRORS IN THE CONDUCT OF THE TRIAL A. Questioning of Witnesses by the District Court. The defendant objects to the questioning by the court of the co-defendant LaFlamme and Michael Wimsatt.8 The defendant points to the fact that the district court questioned LaFlamme about the presence and use of the pug mill on the site, the fact that soil had not been recycled even though Beede had produced manifests to the contrary and the role of Beede in the production and mailing of manifests. The fact questions in this case were not within the every day experience of jurors such as they are in the case of an automobile accident nor did it involve a subject such as homicide, rape or robbery that are unfortunately commonplace in our society. Against that background, it is appropriate to again emphasize the previously discussed "well settled" rule that a trial judge has a "perfect right" to participate in the trial and to question witnesses. United ______ States v. Gonz lez-Soberal, 109 F.3d 64, 72 (1st Cir. 1997). We ______ ________________ therefore view the district court's questioning of LaFlamme, in the context of this case, as a judicial effort to assist the jury in a comprehensive and balanced understanding of relevant facts in a complicated setting and within the permission acknowledged by Fed. R. Evid. 614(b). We find no error.  ____________________ 8 The challenged questioning of Wimsatt has been addressed previously and we see no need to revisit the issue. See supra ___ _____ discussion at 11-14. -21- B. The Refusal of the District Court to Exclude the Testimony of Matthew Kelly. The court issued a sequestration order as to the witnesses and despite that order, the government witness, Matthew Kelly was present for approximately 15 minutes of the testimony of the co-defendant and cooperating witness, Robert LaFlamme. Before allowing Kelly to testify, the trial court engaged in a voir dire of Kelly and then concluded that Kelly could testify. _________ We find neither an abuse of discretion nor prejudice to the defendant in that the defendant was acquitted on the count to which LaFlamme's testimony was directed while Kelly was present. See United States v. Sep lveda, 15 F.3d 1161, 1177 (1st Cir. ___ _____________ _________ 1993) and United States v. Blasco, 702 F.2d 1315, 1327 (11th Cir. _____________ ______ 1983). V. ISSUES RAISED BY THE DEFENDANT IN HIS PRO SE BRIEF V. ISSUES RAISED BY THE DEFENDANT IN HIS PRO SE BRIEF ______ A. Was the defendant impermissibly convicted? The defendant filed a separate brief with this court and argues that the United States Code is not "real" law, and also that he was impermissibly convicted of a violation of the wire fraud statute, 18 U.S.C. 1343 because the legislative history does not explicitly anticipate that telephones and facsimile machines could serve as a basis for a violation of the statute. We find no merit in either argument. VI. THE DENIAL OF THE DEFENDANT'S MOTION FOR A NEW VI. THE DENIAL OF THE DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE TRIAL BASED ON NEWLY DISCOVERED EVIDENCE The defendant filed a motion for a new trial two weeks before his sentencing. The court went forward with the -22- sentencing on June 25, 1996, and then heard the motion on July 24, 1996 and overruled the motion on March 13, 1997. The defendant then appealed the denial. This court then combined the two appeals for a single appellate argument. Recognizing that the standard of review is a "manifest abuse of discretion" as set forth in United States v. Montilla- ______________ _________ Rivera, 115 F.3d 1060, 1064 (1st Cir. 1982), citing United States ______ _____________ v. Andrade, 94 F.3d 9, 14 (1st Cir. 1996), the defendant argues _______ that the denial of the motion based on newly discovered evidence was such an abuse of discretion.  The motion for a new trial based on newly discovered evidence was accompanied by a number of exhibits and affidavits in support of the motion. The main thrust of the materials was anchored in the proposition that had the evidence been presented to the jury, the jury would more likely have believed the defense that Henry did not believe the soils constituted hazardous waste and that he did intend to remediate the soils. The judge conducted a lengthy hearing in which he invited discussion on each of the exhibits and affidavits from counsel and then denied the motion in a carefully crafted 26 page order.  A motion for a new trial based on newly discovered evidence, to be successful, faces a difficult test. The defendant must demonstrate that the evidence was unknown or unavailable at the time of trial despite due diligence and that the evidence was material and likely to result in an acquittal upon retrial. United States v. Tibolt, 72 F.3d 965, 971 (1st Cir. 1995). _____________ ______ -23- The district court found that much of the evidence could have been discovered with due diligence. In that context, we note that the initial indictment was returned on March 2, 1995 and the superceding indictment was filed on January 5, 1996. The trial began on February 6, 1996. Henry and his counsel, whose defense of Henry appears to have been thorough and intense, had nearly a year to prepare for the trial.9 We see no basis to disturb the district court's denial of the motion as it related to the evidence that could have been discovered prior to trial in light of our teachings that an order denying a motion for a new trial will not be reversed except where we find a "manifest abuse of discretion." United States v. Montilla-Rivera, 115 F.3d 1060, _____________ _______________ 1064 (1st Cir. 1997).  Henry did offer a March 28, 1996 report that was clearly new evidence in that the report was not available prior to that time. Sanborn, Head & Associates, a consultant for the State of New Hampshire, released a report assessing various remedial alternatives for the contaminated soil remaining at the Beede site. That report, in an appendix, contained copies of test results conducted by Beede's laboratory that used the 3040 test method. Henry contends that the SHA report was important new evidence as it demonstrated reliance by the State's environment consultant on the same 3040 test method that Henry claimed he had relied on in concluding that the soil removed from  ____________________ 9 Henry was represented by Bjorn R. Lange, an Assistant Federal Defender, who was appointed on March 9, 1995 and remained as Henry's counsel throughout the trial and on appeal.  -24- the Stoneham Laundry site was nonhazardous. The judge acknowledged that the report was new evidence, but concluded it was impeaching and cumulative and not sufficiently probative to warrant a new trial. In reaching that conclusion, the district court opined: Henry has submitted no direct evidence to support his claim that either NHDES [New Hampshire Department of Environmental Safety] or SHA [Sanborn, Head & Associates] relied on the 3040 test results included in the SHA report. Thus, I am asked to infer this reliance from the bare inclusion of the documents in the appendix of the SHA report. The SHA report itself sheds little light on the extent of SHA's reliance on the 3040 test results. These test results were all produced by Beede's own laboratory. SHA included these analyticals in Appendix C of its report. Appendix C is referenced on pages 3-4 of the SHA report under the heading "Soil Pile Descriptions" which states: "Analytical results provided by NHDES for soil collected from piles Nos. 5A, 53, 8 and 10 are included in Appendix C." Appendix C itself consists mainly of numerous test results from Chem Test Lab, apparently ordered by NHDES. In addition to the Chem Test results, there are four test results produced by Beede's laboratory which analyze halogens using the 9020 method, TPH using the GCFID method, and metals levels using the 3040 method. Although these test reports are included in Appendix C, it is unclear to what extent, if any, they were relied upon by SHA. Henry's contention, therefore, that the state relied on his 3040 test analyticals in its assessment of the Beede site's contamination is, at best, uncertain. Even assuming Henry could show that the state relied on Beede's 3040 test analyticals through the SHA report, Henry cannot show that this new evidence is material. Henry bases his argument that the SHA report justifies a new trial mainly on the grounds that it would have assisted him in his -25- impeachment of the testimony of Michael Wimsatt. This new impeachment evidence is not probative enough to suffice as grounds for a new trial. See Pelegrina v. United ___ _________ ______ States, 601 F.2d 18, 21 (1st Cir. 1979) ______ ("impeaching evidence is generally treated as immaterial" on motion for new trial). Finally, even if the SHA report demonstrated that the state relied on the 3040 test and that Henry may also have been justified in relying upon it himself, I cannot conclude that the jury would likely have acquitted Henry if it had been presented with this new evidence. At trial, the government's evidence was not just that Henry mistakenly used the 3040 test as opposed to the TCLP test, but that Henry was provided with TCLP test results showing the soil he was about to transport was hazardous. The likely inference from these facts is that Henry used the 3040 test to convince his customers that the soil was not hazardous and could be accepted at the Beede facility. All these machinations were performed as a part of a scheme whereby Henry agreed to transport soil from New Jersey to a hazardous waste facility in Michigan, but actually had no intention of doing so. Instead, he transported the soil to the Beede facility, dumped it there and then performed the 3040 ____ tests. Henry showed these new test results to his customer in an attempt to convince it that the soil was acceptable for recycling at the Beede facility. Henry's effort to show that he might have reasonably relied on the 3040 test results is unlikely to overcome this evidence of willful deceit.  Appendix at pp. 18-21. Our standard of review is anchored in an acknowledgment that the judge who tried the case is best equipped to examine the issue of whether the new evidence would likely result in an acquittal. In our view, the district court, consistent with his deliberate and thoughtful management of this case, carefully -26- analyzed the impact of the Sanborn, Head & Associates report and we see no basis for disturbing his findings.  For the reasons discussed, we affirm the defendant's conviction and sentence, and we also affirm the district court's denial of the defendant's post-trial motion for a new trial. AFFIRMED. AFFIRMED -27-