UNITED STATES of America,
Plaintiff–Appellee,

v.

Frank FIORILLO, Jr., and Art
Krueger, Defendants–
Appellants.

Nos. 97–10551, 97–10552.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 8, 1999.

Filed July 14, 1999.

As Amended on Denial of Rehearing and
Rehearing En Banc Sept. 10, 1999.

John P. Balazs, Assistant Federal Public Defender, Sacramento, California, for defendant-appellant Frank Fiorillo, Jr., and Sandra Gillies, Woodland, California, for defendant-appellant Art Krueger.

R. Steven Lapham, Assistant United States Attorney, Sacramento, California, for the plaintiff-appellee.

Before: KRAVITCH,[1] REINHARDT, and T.G. NELSON, Circuit Judges.

PER CURIAM:

Frank Fiorillo and Art Krueger appeal their convictions for wire fraud and violations of the Resource Conservation and Recovery Act ("RCRA") (42 U.S.C. §§ 6901 et seq.). Fiorillo also appeals his convictions for receiving explosives without a permit. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part and reverse and remand in part.

## FACTS AND PROCEDURAL HISTORY

Diversey Corp. ("Diversey") is a company engaged in the manufacture and sale of industrial cleaning products. In 1992, Diversey discovered that two of its products, Slurry and Eclipse, would leak out of their containers in warm or humid weather. The two products are industrial-strength cleansers used in institutional settings and both are highly caustic.[2] After determining that the products were unsaleable, Diversey authorized its corporate distribution manager, Adrian Farris, to dispose of 30,000 gallons of the products.

Frank Fiorillo was the president and CEO of West Coast Industries, Inc.

---

[1]. Honorable Phyllis A. Kravitch, Senior Circuit Judge for the Eleventh Circuit Court of Appeals, sitting by designation.

[2]. Materials with a pH level greater than 12.5 are classified as hazardous under federal regulations. *See* 40 C.F.R. § 261.22(a)(1). One of the Government's expert witnesses testified that Slurry and Eclipse had pH levels of 13 to 14. Each one-point difference in pH represents a tenfold increase in the materials' corrosiveness.

("West Coast"). The company's primary business was the storage of a number of products at a warehouse located in Sacramento, California. Fiorillo, who had provided warehouse services to Diversey in the past, submitted a proposal for the disposal of the products to Farris on behalf of West Coast and SafeWaste Corp. ("SafeWaste"), Art Krueger's company. Farris agreed to the proposal and the parties entered into a contract on February 24, 1993, for the disposal of 10,000 gallons of Slurry and Eclipse. Under the contract, Diversey agreed to pay 50% of the contract costs when the products were transported to Fiorillo's warehouse and the remaining 50% upon submission of compliance documentation.

Diversey periodically received compliance documentation from Fiorillo and Krueger in the form of certificates of disposal, which were signed by Krueger. Ultimately, Diversey paid Krueger and Fiorillo $254,000 for the disposal of 30,000 gallons of the hazardous products. In reality, Fiorillo and Krueger only properly disposed of two of the eleven truckloads of Slurry and Eclipse by sending it to a facility in Nevada, which met the requirements set out in RCRA. The rest of the Slurry and Eclipse was stored at Fiorillo's warehouse in Sacramento in a cold room that Krueger leased from Fiorillo.

In August 1993, Rick Knighton, a former West Coast employee, informed David DeMello, a Sacramento County Fire Department official, that West Coast was storing Class A explosives at its warehouse.[3] DeMello, who had conducted earlier fire inspections of the warehouse, and another fire inspector, Robert Billett, went to the warehouse where they informed the receptionist that they were there to conduct an inspection. DeMello's and Billett's testimony conflicts over what happened next.

According to DeMello, the receptionist phoned someone who authorized the inspectors to enter the warehouse. Billett did not recall the receptionist getting permission to let them in. Rather, he remembered that she simply allowed them to proceed with the inspection. Regardless, before the men discovered any explosives, they were met by Fiorillo. DeMello testified that Fiorillo was cordial and polite when he greeted the two men. Fiorillo agreed to accompany the inspectors during the inspection. DeMello and Billett then discovered the Class A explosives, consisting of approximately 17,000 artillery shells, taking up about one-third of the warehouse.[4] DeMello also discovered hazardous material, which covered an additional one-third of the warehouse, leaking from its containers about six feet from the explosives.

Over the course of the next few days, members of the fire department returned to the warehouse to ensure that proper cleanup was occurring and that no further violations were happening. About eight days after DeMello's discovery, the fire captain, Ed Vasques, received an anonymous tip that additional hazardous materials were being stored in a room that the fire inspectors had not discovered. DeMello, Vasques, and other officials conducted a re-inspection of the warehouse and discovered an unmarked door that was hidden behind several pallets of food and beverages.

Peter Bishop, an independent contractor hired by West Coast to assist in the cleanup, entered Fiorillo's office to get keys to the room. An investigator from the Sacramento County environmental office overheard Fiorillo say that there was nothing

---

**3.** When Knighton was a West Coast employee, he had contacted DeMello to inquire whether West Coast met the requirements to store Class A explosives in the Sacramento warehouse. DeMello informed Knighton that West Coast would not be approved to store Class A explosives at its warehouse.

**4.** DeMello later learned that West Coast had previously stored a similar shipment of Class A explosives, which had been shipped out in January 1993.

in the room, that he had done everything they wanted and that he had had enough. Nevertheless, Bishop came back out with the keys. A door outside the warehouse led into the cold room as did a door inside the warehouse. The keys did not work on the outside door, and when Bishop went to unlock the inside door, it was apparently unlocked. At this point, the county officials discovered the Slurry and Eclipse, which Krueger and Fiorillo had told Diversey was destroyed.

Fiorillo was charged with twelve counts of wire fraud (four of the counts were dismissed by the Government prior to trial), two counts of violating provisions of RCRA, and two counts of receiving Class A explosives without a permit. Krueger was charged with all of the same counts except those relating to the explosives. A jury found both men guilty of all the counts against them.

## ANALYSIS

### A. The Searches of the Warehouse

Prior to going to trial, Fiorillo and Krueger moved to suppress the evidence found at the warehouse because the searches were conducted without a warrant. The district court denied the motion concluding that Fiorillo and Krueger did not have standing to challenge the initial inspection of the warehouse because they did not have a reasonable expectation of privacy regarding the main warehouse floor. The district judge also ruled that even if they did have standing, the receptionist and Fiorillo consented to the inspection. The judge also determined that Fiorillo had apparent authority to consent to the inspection of the cold room. We agree that Fiorillo consented to the search of the cold room as well as the main floor of the warehouse and that he had apparent authority as to the former.

### 1. Standard of Review.

■ "The validity of a warrantless search is reviewed *de novo*." *See United States v. Kyllo*, 140 F.3d 1249, 1252 (9th Cir.1998). This court reviews *de novo* a district court's denial of a motion to suppress evidence seized in a search. *United States v. Kemmish*, 120 F.3d 937, 939 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1087, 140 L.Ed.2d 144 (1998). Factual findings underlying that decision are reviewed for clear error. *See id.*

### 2. Main Floor of the Warehouse.

■ This court will "not disturb a district court's determination that a person's consent to search was voluntary unless that determination was clearly erroneous." *United States v. Chan–Jimenez*, 125 F.3d 1324, 1326–27 (9th Cir.1997).

The district court found that, even if Fiorillo and Krueger had standing to object to the warrantless search of the main warehouse floor, West Coast's receptionist and Fiorillo consented to the search. West Coast's receptionist consented to let the fire inspectors enter the warehouse where the men then encountered Fiorillo. Prior to the inspection and subsequent discovery of the explosives, Fiorillo consented to the search of the main warehouse floor.

■ There is sufficient evidence in the record to support the district court's conclusion. DeMello and Billett presented themselves to the receptionist; they were wearing their uniforms; they showed her their credentials; and they informed her they were there to conduct an inspection. Whether or not the receptionist made a call to the warehouse supervisor is irrelevant. She controlled the reception area of the warehouse and told the inspectors they could pass through and enter the warehouse. Prior to actually commencing the inspection, DeMello and Billett were greeted by Fiorillo who recognized DeMello from previous inspections and treated them cordially and courteously. When the fire officials told Fiorillo they were there to conduct an inspection, Fiorillo asked them where they would like to start and then accompanied them. If Fiorillo had not wanted the men to conduct an inspection of the warehouse, he could have

stopped them at this point, but he chose not to do so.

■ Fiorillo contends that any consent is invalid because the fire inspectors said they were there to conduct a fire inspection, not an inspection for explosives. The district court rejected this argument. The City of Sacramento fire code states that the purpose of a fire inspection is to inspect for conditions that would reasonably tend to cause a fire or contribute to its spread. Undoubtedly, the presence of Class A explosives could cause a big fire or make a small fire into a big one. A fire inspection unquestionably includes an inspection for the unlicensed storage of Class A explosives. The district court did not clearly err in determining that consent was given to search the main floor of the warehouse.

3. *The Cold Room.*

■ After receiving a tip that the fire department had failed to locate some hazardous materials hidden in a cold room within the warehouse, fire department and county officials returned to the warehouse. Upon finding the cold room, they discovered that they could not enter it. Peter Bishop, an independent contractor employed by West Coast to assist in the cleanup of the warehouse, got a key from Fiorillo and helped the officials gain entry into the cold room where they discovered the leaky containers of Eclipse and Slurry. When Bishop asked Fiorillo for a key, one of the officials overheard Fiorillo indicate to Bishop that there was nothing in the room, that he had been cooperative and that he had had enough. Only after officials had entered the room did they learn Krueger leased the room from Fiorillo. The district court held that the warrantless search of the cold room was valid because Fiorillo had apparent authority to consent to the search. We agree.

■ A determination of apparent authority presents mixed questions of fact and law and is reviewed *de novo. See United States v. Kim,* 105 F.3d 1579, 1581

(9th Cir.), *cert. denied* —— U.S. ——, 118 S.Ct. 353, 139 L.Ed.2d 274 (1997).

> The existence of apparent authority entails a three-part analysis. First, did the searching officer believe some untrue fact that was then used to assess the consent-giver's use of and access to or control over the area searched? Second, was it under the circumstances objectively reasonable to believe that the fact was true? Finally, assuming the truth of the reasonably believed but untrue fact, would the consent-giver have had actual authority?

*United States v. Dearing,* 9 F.3d 1428, 1429–30 (9th Cir.1993) (citations omitted).

The officials seeking entrance to the cold room believed that it was simply part of the warehouse leased to West Coast. There were no signs on the doors to indicate that the room was being leased to or under the control of SafeWaste. They believed that Fiorillo, as president of West Coast, could consent to let them into a locked room that they believed was under the control of his company. They had no reason to believe and in fact did not believe that Krueger leased the room from West Coast.

Under the circumstances, it was reasonable for the officials to believe these incorrect facts were true. Fiorillo gave a key to the room to Bishop with the knowledge that it was to let the inspecting officials into the room. At that time, he could have informed the officials that the room was leased to Krueger and that he could not let them in. For some unknown reason, Fiorillo chose not to tell the officials that Krueger leased the room until after they had entered the room and discovered the hazardous products. It was not unreasonable for the officials to believe that Fiorillo could consent to let them search the room when he, as president of the company running the warehouse of which the cold room was a part, provided the key for them to enter.

If it were true that West Coast had exclusive control over the cold room and that the room was not leased to Krueger,

Fiorillo as president of West Coast would have had actual authority to consent to the search of the cold room. The district court did not err in determining that the officials correctly relied on Fiorillo's apparent authority to consent to the search of the cold room.

**B.** *Severance of the Explosives Counts*

Fiorillo argues that the district court misjoined the explosives counts with the wire fraud and hazardous waste counts against him. Misjoinder of charges is an issue of law reviewed *de novo.* *See United States v. VonWillie,* 59 F.3d 922, 929 (9th Cir.1995).

The standard for determining whether two or more offenses should be tried together is set out in Federal Rule of Criminal Procedure 8(a).[5] In determining whether the offenses are based on the same transaction, " 'transaction' is to be interpreted flexibly and may comprehend a series of related occurrences." *United States v. Terry,* 911 F.2d 272, 276 (9th Cir.1990) (internal quotation marks omitted). In making an assessment of whether joinder was proper, this court examines only the allegations in the indictment. *See VonWillie,* 59 F.3d at 929.

In *VonWillie,* this court held that testimonial and physical evidence relating to the location, discovery, and seizure of firearms were factors favoring joinder of the charges. *See id.* In this case, the explosives and hazardous materials were both stored in the same warehouse, the discovery of the explosives led to the discovery of the hazardous materials, and both the explosives and the hazardous material were being stored without proper permits. All of these facts indicate that the explosives charges and the hazardous material charges were of similar character, meeting the requirements of Rule 8(a). Additionally, at least three witnesses testified at the trial concerning both the explosives and the hazardous waste. The district court did not err in concluding that joinder of the charges was proper.

Even if misjoinder had occurred in this case, reversal is only required "if the misjoinder results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *Terry,* 911 F.2d at 277 (internal quotation marks omitted). Fiorillo has not met this requirement. He argues that the jury was prejudiced because the explosives counts constituted evidence of other crimes and that the knowledge that he stored 17,000 artillery shells in a warehouse close to hazardous materials was inflammatory. However, at the close of trial, the judge charged the jury to deliberate on the elements of each charge separately and reminded them that a separate crime was charged against each defendant.

This militates against a finding of prejudice. *See United States v. Matta–Ballesteros,* 71 F.3d 754, 771 (9th Cir.1995). "Judicial economy justifies reliance on the jury to follow the instructions of the court that segregate the evidence and limit the applicability of the evidence" as to each count. *Id.* (internal quotation marks omitted).

**C.** *Title 42 U.S.C. § 6928(d)(1)*

The indictment charged Fiorillo and Krueger with "knowingly stor[ing] corrosive hazardous waste" in violation of 42 U.S.C. § 6928(d)(2)[6] and with "know-

---

**5.** "Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Fed.R.Crim.P. 8(a).

**6.** Superseding Indictment, ER1–1, 5. This subsection of the statute provides:

Any person who-

. . . .

(2) knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter-

(A) without a permit under this subchapter . . . or

ingly transport[ing] and caus[ing] to be transported a corrosive hazardous waste" in violation of 42 U.S.C. § 6928(d)(1).[7] The jury found both defendants guilty on both counts. Fiorillo and Krueger challenge their convictions for violating section 6928(d)(1), asserting that its "causes to be transported" provision applies only to those who generate hazardous waste for transport by others. The Government argues that the "causes to be transported" prohibition is not limited to hazardous waste generators and that the defendants properly were convicted of both storing and causing transportation of hazardous waste. We agree with the defendants that a person who merely receives hazardous waste does not "cause[ ]" that waste "to be transported" under section 6928(d)(1). We nevertheless affirm the defendants' convictions because the record shows that Fiorillo and Krueger took responsibility for and carried out the transportation of the Eclipse and Slurry from Diversey's storage location to the West Coast warehouse.

 We review questions of statutory interpretation *de novo*. *See United States v. Doe*, 136 F.3d 631, 634 (9th Cir. 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1338, 143 L.Ed.2d 502 (1999). Examination of the plain "language of the statute itself" always marks the starting point of our analysis. *See Hughey v. United States*, 495 U.S. 411, 415, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990). In addition to "the particular statutory language," however, we look "to the design of the statute as a whole." *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990). If application of these guidelines reveals a clear meaning, we examine the legislative history only to determine "whether there is clearly expressed legislative intention contrary to [the statutory] language, which would require us to question the strong presumption that Congress expresses its intent through the language it chooses." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quotation omitted). With these principles in mind, we turn to the task of examining section 6928(d)(1).

 Fiorillo and Krueger assert that their actions of unlawfully receiving and storing hazardous waste did not "cause[ ]" the transportation of that waste under section 6928(d)(1); the Government refutes this contention.[8] The word "cause" has a plethora of meanings. Among its common definitions are "to bring about," "to compel," *see Black's Law Dictionary* 200 (5th

---

(B) in knowing violation of any material condition or requirement of such permit; or
(C) in knowing violation of any material condition or requirement of any applicable interim status regulations or standards;
. . . .
shall, upon conviction, be subject to [a fine or imprisonment, or both].
42 U.S.C. § 6928(d)(2).

**7.** Superseding Indictment, ER1–1, 6. This subsection of the statute provides:

Any person who-
(1) knowingly transports or causes to be transported any hazardous waste identified or listed under this subchapter to a facility which does not have a permit under this subchapter . . .
. . . .
shall, upon conviction, be subject to [a fine or imprisonment, or both].

42 U.S.C. § 6928(d)(1).

**8.** In its brief, the Government noted Fiorillo's contention that "he could not be convicted of causing the transportation of the hazardous waste he received from Diversey Corporation," Gov't Br. at 37, and proceeded to argue that Fiorillo's position was incorrect "because the 'causes to be transported' language in § 6928(d)(1)" "is not limited to 'generators' of hazardous waste." *Id*. At oral argument, the Government represented Fiorillo's activities with respect to the transportation as follows: "Mr. Fiorillo in essence said [to Diversey], 'you bring me your hazardous waste, and I'll get rid of it for you.'" It was this conduct, according to the Government, that "cause[d]" the transportation of the hazardous waste. The Government specifically directs its argument at Fiorillo's activities but notes that Krueger joins Fiorillo's brief on this issue. *See id*. We assume, therefore, that the Government's argument extends to Krueger.

ed.1979), and "to effect by command, authority, or force," *see Webster's New Collegiate Dictionary* 175 (1979). Various legal standards draw fine lines between types of "causation"—ranging from an indirect, peripheral contribution to an immediate and necessary precedent of an event. Looking at the word "cause" itself, therefore, does not allow us to discern the specific actions to which Congress intended to attach criminal liability under section 6928(d)(1). The statute's overall structure reveals, however, that as Congress used the phrase here, "causes to be transported" does not include a warehouse's receipt of hazardous waste pursuant to a contract.

Section 6928(d) contains a comprehensive, seven-item list of acts related to hazardous waste management for which the Federal government imposes criminal penalties. Each of the seven subdivisions addresses a particular category of prohibited activity. For example, subsection (d)(3) pertains to making false representations in required documentation of hazardous waste; subsection (d)(4) pertains to the destruction of, alteration of, or failure to file any required documentation; and subsection (d)(6) pertains to the exportation of hazardous waste to other countries. *See* 42 U.S.C. § 6928(d). More pertinent to the issue before us, subsections (d)(1) and (d)(2) penalize two distinct sets of acts involving the handling of hazardous waste without a permit. Subsection (d)(1) addresses transporting and causing to be transported hazardous waste to a facility lacking a permit, whereas subsection (d)(2) addresses treating, storing, and disposing of hazardous waste without or in violation of a permit. *See id.* By dividing these activities into two categories, Congress demonstrated that, despite the similarities between the prohibitions in subsections (d)(1) and (d)(2), it intended to distinguish between these two groups of conduct in some way. The principal distinction is that subsection (d)(1) describes activities connected to the creation and shipping of hazardous waste, while subsection (d)(2) covers only the receipt and processing of the waste. Stated another way, subsection (d)(1) pertains to the direction of hazardous waste to a facility that lacks a permit, whereas subsection (d)(2) addresses activities occurring at the unpermitted facility.

We acknowledged this distinction between subsections (d)(1) and (d)(2) when discussing a different aspect of those provisions in *United States v. Speach,* 968 F.2d 795 (9th Cir.1992). *Speach* presented the issue of whether the Government must prove that a section 6928(d)(1) defendant knew that the recipient facility of the hazardous waste lacked a permit. We answered this question in the affirmative, relying in part upon the following reasoning:

> [T]he two provisions [ (d)(1) and (d)(2) ] target different groups of defendants. Section 6928(d)(2)(A) imposes criminal liability on the person who knowingly treats, stores, or disposes of waste, when he or his facility lacks a permit, whether or not he knew that the permit was lacking....
>
> In contrast, section 6928(d)(1) deals not with the violator's lack of a permit, but with the lack of a permit on the part of the person to whom the violator delivers hazardous waste.

*Id.* at 797. In this passage, *Speach* implicitly recognized that the violator of subsection (d)(1) is the person responsible for making the delivery of hazardous waste, not the person who merely accepts the shipment.[9]

---

**9.** A secondary difference between subsections (d)(1) and (d)(2) is that subsection (d)(1) simply prohibits performing the activities in question-transporting and causing to be transported-to a facility that does not have a permit, *see* 42 U.S.C. § 6928(d)(1), whereas subsection (d)(2) prohibits performing the activities in question-treating, storing, or disposing-without a permit *or* in knowing violation of any condition or requirement of a permit, *see*

42 U.S.C. § 6928(d)(2). This difference follows from and helps illustrate the primary distinction between the activities upon which each provision focuses. Subsection (d)(1) logically holds liable transporters and those causing transportation only for sending or delivering hazardous waste to a facility lacking a permit, because what the recipient does with the waste after accepting it is beyond the transporter's control. In contrast, subsection

■ The duplicate coverage of the same conduct that would result if we adopted the Government's interpretation of section 6928(d)(1) supplies additional structural evidence supporting our understanding of this provision. The Government contends that any person who, without a permit, "receive[s] hazardous waste after it has been shipped from the generating facility" "causes to be transported" that hazardous waste in violation of subsection (d)(1).[10] If this interpretation of the statute were correct, the same act-receiving hazardous waste-would subject the actor to liability under subsection (d)(2)(A) as well as subsection (d)(1).[11] This construction would contradict logic and ignore the basic assumption that Congress does not use different language in different provisions to accomplish the same result.[12] Following this presumption, therefore, we construe section 6928(d)(1) as applying to conduct other than that covered under section 6928(d)(2).

Another of the seven categories of criminal conduct listed in section 6928–subsection (d)(5)—provides the final piece of structural evidence upon which we rely in concluding that subsection (d)(1) does not apply to a person who merely receives and stores hazardous waste without a permit. Subsection (d)(5) imposes criminal penalties on any person who "knowingly transports without a manifest, or causes to be transported without a manifest, any hazardous waste [required] to be accompanied by a manifest." 42 U.S.C. § 6928(d)(5). A "manifest" is "the form used for identifying the quantity, composition, and the origin, routing, and destination of hazardous waste," 42 U.S.C. § 6903(12); various provisions of the federal hazardous waste management laws hold *generators* of hazardous waste responsible for providing this form to the transporter.[13] Subsection (d)(5), therefore, proscribes the same two activities that subsection (d)(1) addresses—transporting and causing to be transported [14]—

---

(d)(2)'s proscription of treating, storing, or disposing of hazardous waste without a permit, as well as in violation of any material condition or requirement of a permit, demonstrates Congress's concern in this provision with regulating the activities of processors, who, unlike transporters, "are in a position to control" those activities. *United States v. MacDonald & Watson Waste Oil Co.*, 933 F.2d 35, 49 (1st Cir.1991) (discussed *infra*); *see generally Speach*, 968 F.2d at 797 (discussing each provision's limitation of liability to person in best position to know law's requirements).

**10.** Gov't Br. at 37 (quoting 42 U.S.C. § 6928(d)(1)).

**11.** *See supra* notes 6–7 (setting out text of subsections (d)(2) and (d)(1)). Although subsection (d)(2)(A) does not address "receipt" of hazardous waste, we cannot conceive of a situation in which a person who did not have a permit could receive hazardous waste without subsequently "treat[ing], stor[ing], or dispos[ing] of" that waste. 42 U.S.C. § 6928(d)(2)(A). In fact, RCRA's definitions of the latter three terms establish that treatment, storage, and disposal occupy the field of possibilities for a recipient of hazardous waste: a person who has it either must keep it, get rid of it, or change it into something else. *See* 42 U.S.C. § 6903(3) (defining "disposal"); *id.* § 6903(33) ("The term 'storage'

... means the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste."); *id.* § 6903(34) ("The term 'treatment' ... means any method ... designed to change the ... character or composition of any hazardous waste ... so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume.").

**12.** *See e.g., Moore v. Harris*, 623 F.2d 908, 914 (4th Cir.1980) (noting that the "use of different language creates the inference that Congress meant different things").

**13.** *See, e.g.,* 42 U.S.C. § 6921(d)(3) (any shipment of hazardous waste generated by a small quantity generator must be accompanied by a manifest "form signed by the generator"); 42 U.S.C. § 6922(b) (required manifest must contain "a certification by the generator" of certain facts).

**14.** That both subsection (d)(1) and subsection (d)(5) address "transport[ing]" and "caus[ing] to be transported" hazardous waste does not undermine our earlier observation, *see supra* at 7770, that each of section 6928(d)'s seven subdivisions pertains to a distinct body of conduct. Subsection (d)(1) addresses these two actions in conjunction with making deliv-

and imposes conditions with which only a generator of hazardous waste reasonably can comply. This provision reinforces our understanding that subsection (d)(1) pertains to persons responsible for the delivery of hazardous waste, not merely the receipt of it, because only a generator (who supplies the manifest) or a transporter (who must obtain it before undertaking the transportation) reasonably could be expected to comply with these requirements.

In light of our conclusion, based upon our examination of the face of the statute, that Congress did not intend section 6928(d)(1) to apply to persons who do no more than receive hazardous waste, we examine the provision's legislative history only to determine whether Congress failed to express its actual intent in the language of the statute. When Congress enacted section 6928 in 1976, subsection (d)(1) prohibited only "knowingly" "transport[ing] ... hazardous waste ... to a facility which does not have a permit." Pub.L. No. 94–580, 90 Stat. 2795, 2812 (1976). In 1984, Congress amended the statute, adding the "causes to be transported" language. The House Report accompanying the 1984 amendments explains the reasoning behind this addition:

> This provision clarifies the criminal liability of generators of hazardous waste who knowingly cause the waste to be transported to an unpermitted facility. Because the generator is in the best position to know the nature of his waste material, the regulatory scheme established by RCRA places a duty on the generator in the first instance to make arrangements to transport and dispose of his waste properly. EPA's ability to obtain criminal penalties against generators who knowingly cause the transportation of hazardous waste to an unpermitted facility is essential to the regulatory scheme.

H.R.Rep. No. 98–198, pt. I (1984), *reprinted in* 1984 U.S.C.C.A.N. 5576, 5613. Far from indicating that Congress meant subsection (d)(1) to apply to anyone who merely accepts delivery of a shipment of hazardous waste, the House Report strengthens our understanding, based upon the statute's language and structure, that this provision applies only to those persons responsible for initiating, arranging for, or actually performing the transportation of the waste.

The Government contends that other circuits have interpreted section 6928(d)(1) to apply to persons who participate but minimally in facilitating the transportation of hazardous waste. In particular, the Government cites the First Circuit case of *United States v. MacDonald & Watson Waste Oil Co.,* 933 F.2d 35 (1st Cir.1991), in which MacDonald & Watson, a company "in the business of transporting and disposing of waste oils and contaminated soil," *id.* at 39, one of its officers, and two of its employees were convicted of violating subsection (d)(1). *See id.* at 39–40. One of the employees challenged her conviction, contending that insufficient evidence existed that she "caused" the transportation of the hazardous waste, but the court affirmed the conviction based upon evidence that her "role in negotiating, reviewing and facilitating the contract *on behalf of MacDonald & Watson* directly assisted in causing the transportation of the material." *Id.* at 42 n. 4 (emphasis added). The Government erroneously focuses upon the arguably supplemental part this employee played in arranging the transportation and the First Circuit's upholding of her conviction in spite of that role. For purposes of assessing the scope of subsection (d)(1), the critical point in *MacDonald & Watson* is that this employee worked for the company that removed the contaminated soil from its point of origin and transported it to a disposal facility, activities that all parties in this

---

ery to a facility lacking a permit, whereas subsection (d)(5) pertains to the undertaking

of these activities without a manifest.

case concede subsection (d)(1) covers. The court's conclusion regarding the sufficiency of the evidence to support the employee's conviction simply pertains to her degree of responsibility for MacDonald & Watson's conduct; that her participation, if significant enough to implicate her at all, related to the transportation of the hazardous waste, was never in doubt. *See id.* (noting employee's "position of responsibility with MacDonald & Watson" and fact that she reviewed the contracts on behalf of the company in finding evidence sufficient to support her conviction).

Although *MacDonald & Watson*'s sufficiency of the evidence discussion merely confirms the obvious-that transporters of hazardous waste may be liable under subsection (d)(1)-other portions of the opinion support our reading of the statute. In comparing subsection (d)(1) to subsection (d)(2), the First Circuit stated:

> Since *generators and transporters* have little control over either the operation of the facility or the manner of disposal after the wastes are delivered to the facility, it is not surprising that *subsection (d)(1)* omits a provision relating to manner of disposal, and limits *generator and transporter* responsibility to ensuring that the facility has an appropriate permit for the type of waste being delivered.

*Id.* at 49 (emphasis added).[15]

We must clarify that our interpretation of this provision does not mean that a person must be in the business of generating or transporting hazardous waste in order to run afoul of section 6928(d)(1). In some circumstances, the intended recipient of hazardous waste may also violate subsection (d)(1) by personally undertaking the transportation of the hazardous waste or by making arrangements for a third party to perform that task. Recognizing this possibility, we decline to adopt the interpretation of the statute, advocated by the defendants, that subsection (d)(1) applies only to generators and transporters of hazardous waste. Instead, we hold that the language of section 6928(d), its structure, and its legislative history dictate that subsection (d)(1) does not apply to a person who does not participate in or direct the transportation of hazardous waste, but merely receives that waste.

■ Turning our attention to these defendants' conduct, we first note that, because the jury found both defendants guilty of violating subsection (d)(1), we must construe the record in the light most

---

15. The case that most strongly supports the Government's argument is *United States v. Henry*, 136 F.3d 12 (1st Cir.1998), in which the defendant owned and directed a company that had a permit allowing it to recycle contaminated soil but restricting the amount of the soil it could store at its facility. The company violated the permit by accepting far more soil than the permit authorized it to store. The indictment charged Henry with conspiring to violate section 6928(d)(1) but did not charge him substantively with the violation of that statute. *See id.* at 14–15. Of the three overt acts charged in furtherance of the conspiracy, however, two alleged that Henry "caused the soils to be transported to [the facility]." *Id.* at 15 n. 1. The First Circuit affirmed his conviction.

*Henry* seems implicitly to recognize the Government's interpretation of section 6928(d)(1), but two factors distinguish the case from the one before us. First, and most importantly, the *Henry* opinion gives no indication that the defendant raised the argument that Fiorillo and Krueger present to us. The opinion therefore does not address the question whether mere receipt of hazardous waste constitutes transporting or causing waste to be transported, and accordingly includes virtually no discussion of the nature of the acts that the defendant committed that subjected him to criminal liability for conspiracy to violate section 6928(d)(1). Although two overt acts are specified in the opinion, the opinion offers no explanation of the particular role, if any, that the defendant played in arranging the transportation of the waste; nor does it reveal the nature of the third overt act, which could have provided the basis for the jury's finding of liability. Moreover, evidence that would support a conviction for conspiracy to cause hazardous waste to be transported would not necessarily be sufficient to establish a substantive violation of the statute. To the extent that *Henry* is not distinguishable from the present case, however, we disagree with the First Circuit's conclusion in that case.

favorable to the Government.[16] According to Farris, he solicited bids from three companies, including SafeWaste, when he learned Diversey needed to dispose of the Eclipse and Slurry. In response to this inquiry, Fiorillo submitted to Farris a written proposal, dated January 26, 1993.[17] Farris accepted Fiorillo's bid because it was the lowest and because they previously had had a good working relationship.[18] On February 24, 1993, Farris, Fiorillo, and Krueger signed another document printed on West Coast letterhead that was substantially identical to the January 26 letter and that also was styled as a proposal letter from Fiorillo to Farris.[19] As Farris testified, however, and as the writing itself indicates, the February 24 document actually was a memorialization of a meeting among the three men, and it constituted the contract to which all three were parties.[20] The contract states:

> Per our meeting today with yourself [Farris], Art Krueger (SafeWaste Corp.) and myself [Fiorillo], regarding your warehoused hazardous material. The following is our proposal for handling, *transportation,* disposal and EPA compliance documentation for Diversey products Eclipse, Slurry, and PEP in one and six gallon containers.

| Service | Cost |
| --- | --- |
| . . . . | |
| Freight (from current ware-house location or any "in-line" multiple stop locations to disposal site). | $17,760.00 per load |

. . . .

*Terms*

A. On a load by load basis, 50% of the billing amount is to be paid upon confirmed pick-up of the product from your warehouse site or the last stop on a multiple site pick-up.

. . . .

*Assumptions*

. . . .

2. You will deliver to us an accurate location, address, contact name and phone number of all inventory as described on your product disposal form.

3. You will give us the authority to request an accurate inventory and product condition description for each location.[21]

Below Fiorillo's signature is the heading "Sign Off An [sic] Approval."[22]

Signature lines for Fiorillo, Krueger, and Farris as representatives of their respective corporations appear under this heading; all three signed this document on February 24, 1993.[23]

Other evidence exists that Krueger and Fiorillo actually arranged for and conducted the transportation of the Eclipse and Slurry from Diversey's storage facilities. Throughout his extensive testimony, Farris frequently asserted that Fiorillo undertook the transportation[24] and that Krueg-

---

16. *See United States v. Halbert,* 640 F.2d 1000, 1008 (9th Cir.1981) ("In reviewing a criminal conviction, the evidence must, of course, be viewed in the light most favorable to the prosecution.").

17. *See* Test. of Adrian C. Farris, Trial Tr. Vol. II, at 423–26. Farris testified that Krueger's company, SafeWaste, was one of the three companies from which he solicited bids, but that Fiorillo responded to the solicitation on behalf of both defendants. *See id.* at 419, 424. At times, the proposal is characterized as the "West Coast/Fiorillo/SafeWaste bid." *See id.* at 425.

18. *See id.* at 425–26.

19. *See Id.* at 429–33.

20. *See Id.*

21. Gov't Ex. 38, ER 271–72 (emphasis added).

22. *Id.*

23. *See id.*

24. *See, e.g.,* Farris Test., Trial Tr. Vol. III, at 515 (in response to a question regarding how much material Farris had shipped to Fiorillo's warehouse, "I didn't ship anything to his warehouse."); *id.* at 598 (in response to a question about whether Fiorillo ever request-

er participated in this activity, as well.[25] Farris also offered examples of contacts he had had with both defendants that supported his account of Fiorillo's and Krueger's responsibilities.[26] Significantly, there is no evidence in the record contradicting Farris's account that defendants undertook and incurred the costs of transporting the Eclipse and Slurry. Based upon this evidence, the jury reasonably could have determined that Fiorillo and Krueger did much more than simply receive the hazardous waste and store it: they proposed (and Farris agreed) that Diversey would pay them to make arrangements for transporting the waste to the West Coast warehouse.

■■■ We are at a loss to understand why the Government argued on appeal that section 6928(d)(1) applies to those who merely receive hazardous waste, implicitly asserting that we would have to adopt that construction of the statute in order to affirm these convictions, when the record plainly reveals that even under our narrower interpretation of subsection (d)(1), Fiorillo and Krueger violated this provision. Irrespective of the Government's failure to frame this issue appropriately either in its brief or at oral argument, however, we may not ignore record evidence that unquestionably supports the reasonableness of the jury's verdict. Despite our conclusion that section 6928(d)(1) does not apply to persons who merely receive hazardous waste, we affirm the defendants' convictions for transporting or causing the transportation of hazardous waste to a facility lacking a required permit.

D. *Exceptions to 18 U.S.C. § 842(a)(3)(A)*

The jury found that Fiorillo violated 18 U.S.C. § 842(a)(3)(A) by receiving explosives without a license.[27] Fiorillo raises the argument, however, that this section should not apply to him because of two exceptions set out in 18 U.S.C. § 845. The district court ruled that the exceptions did not apply. This court reviews a district court's construction or interpretation of a statute *de novo. See United States v. Doe,* 136 F.3d at 634.

1. *Title 18 U.S.C. § 845(a)(1).*[28]

■■■ Fiorillo argues that this exception should apply to him because the explosives

---

ed that Farris stop sending material to him, "No. Well, I didn't send the product. He picked it up. And he never made mention of the fact that he could not pick it up.").

25. *See, e.g.,* Farris Test., Trial Tr. Vol. II, at 419 (identifying Krueger's SafeWaste as actual respondent to first bid solicitation); *id.* at 424 ("Mr. Fiorillo said that he had the opportunity with SafeWaste that they would take it to a facility ...."); *id.* (in response to a question regarding Fiorillo's reaction to Farris's explanation of his problem, "That he, with SafeWaste, with Art Krueger, had done this before, they had removed solvents and paints, and they knew how to get rid of it.").

26. *See, e.g.,* Farris Test., Trial Tr. Vol. II, at 433–35 (explaining Farris's relationship with Krueger and complaint that he received from Krueger after transport and disposal of the first load of waste, in which Krueger requested more money because he had underbid the project); Farris Test., Trial Tr. Vol. III, at 530:

Q: [Y]ou contracted for 10,000 [pounds of hazardous waste of which Diversey needed to dispose]. You indicated that at some point in time you told Mr. Fiorillo that we have a contract, I don't care if the transpor-

tation costs are more than you thought, we have a contract—right?
A: That is correct.
Q: And was this in response, as I recollect, to a call that you got from Mr. Krueger saying that it's not economically feasible to continue on this way because transportation costs are too high?
A: Correct.

27. Section 842(a)(3)(A) states:
(a) It shall be unlawful for any person
....
(3) other than a licensee or permittee knowingly
(A) to transport, ship, cause to be transported, or receive in interstate or foreign commerce any explosive materials....
18 U.S.C. § 842(a)(3)(A).

28. Section 845(a)(1) states:
(a) Except in the case of subsections [not at issue in this case], this chapter shall not apply to:
(1) any aspect of the transportation of explosive materials via railroad, water, highway, or air which are regulated by the United States Department of Transportation and agencies thereof[.]
18 U.S.C. § 845(a)(1).

found in his warehouse were regulated by the Department of Transportation. Under his interpretation, no person could be liable under section 842(a)(3)(A) for receiving explosives without a license if those explosives are in some way regulated by the Department of Transportation. Fiorillo's construction eviscerates section 842(a)(3)(A). If this court were to adopt Fiorillo's interpretation, an unlicensed individual who received a case of dynamite from a third party would not be liable because the Department of Transportation has regulations that classify the dynamite and dictate how it should be transported. Essentially, no one in the Ninth Circuit would ever again be liable under section 842(a)(3)(A).

■ Looking at the plain language of sections 842(a)(3)(A) and 845(a)(1), it is clear that the exception does not apply to Fiorillo. Section 842 states that it is a crime for an unlicensed individual to "transport, ship, cause to be transported, or receive in interstate commerce" any explosive material. Fiorillo was found guilty of *receiving* explosives without a license.[29] The exception in section 845(a)(1) by its own terms only applies to the transportation of explosives, not the receipt of explosives. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). If Congress intended to include the receipt of explosives within the exceptions, it

would have done so expressly as it did in section 845(a)(3).

■ Additionally, under accepted canons of statutory interpretation, statutes are to be interpreted as a whole. *See Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir.1991). One provision of a statute should not be interpreted in a manner that renders other sections of the same statute "inconsistent, meaningless or superfluous." *Id.* Fiorillo's interpretation of section 845(a)(1) would render section 842(a)(3)(A) meaningless. He simply interprets the exception too' broadly. The district court did not err in denying Fiorillo's motion to dismiss the explosives charges against him.

2. *Title 18 U.S.C. § 845(a)(3).*[30]

Fiorillo received the explosives from the A.J. Fritz Company, packed them in ocean containers for shipment to Taiwan, and delivered them (or was to deliver them) to the Concord Naval Weapons Station. He argues that the Concord Naval Weapons Station is a Government agency, so the exception under section 845(a)(3) should apply. A closer examination of the process by which the explosives were to go from the A.J. Fritz Company to Taiwan reveals that a Taiwanese company, Yang Ming, was also involved.

■ According to Fiorillo, Yang Ming is the entity that shipped the first shipment of explosives out of his warehouse. While it is not clear what was to happen to the second shipment of explosives, Fiorillo described Yang Ming as "the exclusive ocean forwarder for the Taiwanese government." If that is true, then presumably Yang Ming was also to deliver the second

---

**29.** This also distinguishes Fiorillo's case from *United States v. Illingworth*, 489 F.2d 264 (10th Cir.1973) (charge against defendant for *transporting* explosives without a license dismissed); *United States v. Petrykievicz*, 809 F.Supp. 794 (W.D.Wash.1992) (same); *United States v. Scharstein*, 531 F.Supp. 460 (E.D.Ky. 1982) (finding that § 845(a)(1) was inapplicable to defendant who manufactured and *transported* illegal fireworks).

**30.** Section 845(a)(3) states:
 (a) Except in the case of subsections [not at issue in this case], this chapter shall not apply to:
 . . . .
 (3) the transportation, shipment, receipt, or importation of explosive materials for delivery to any agency of the United States. . . .
18 U.S.C. § 845(a)(3).

shipment of explosives, which the fire inspectors discovered, to Taiwan via the Concord Naval Weapons Station. Under these circumstances, Fiorillo was not transporting, shipping, or receiving "explosive materials *for delivery to* any agency of the United States" as the statutory exception requires. *See* 18 U.S.C. § 845(a)(3) (emphasis added). Instead, he was receiving and shipping explosive materials for delivery to Taiwan. The mere fact that a United States Naval Base was a stopping point on the carrier's delivery route does not bring Fiorillo's actions within the protection of section 845(a)(3). That statute excepts from criminal liability those who receive, transport, ship, and import explosive materials for delivery to, not through, a government agency.[31]

### E. *Sufficiency of the Evidence*

■■■■ Krueger contends that the evidence was insufficient for the jury to conclude that Slurry and Eclipse were hazardous waste. The evidence is sufficient to support a conviction if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Code of Federal Regulations classifies aqueous material with a pH level greater than 12.5 as hazardous. *See* 40 C.F.R. § 261.22(a)(1). One of the Government's expert witnesses testified that Slurry and Eclipse had pH levels of 13 to 14, and Krueger concedes that Slurry and Eclipse are hazardous.

In order to show that Slurry and Eclipse were hazardous waste, the Government was also required to show that Slurry and Eclipse were discarded materials. If Diversey, the generator of Slurry and Eclipse, intended to dispose of the hazardous materials, it became hazardous waste. Krueger contends that the evidence was insufficient to show that Diversey intended

to dispose of Slurry and Eclipse. Krueger's argument fails.

Factors indicating that Diversey intended to dispose of the materials included evidence that Adrian Farris, a Diversey employee, was authorized by Diversey to *destroy* unsaleable containers of Slurry and Eclipse; Farris explained to Fiorillo that he wanted the material picked up from warehouses in which it was stored across the country and taken to a place to be *destroyed;* Farris received a proposal for *disposal* from Fiorillo and Krueger; and Diversey paid Krueger and Fiorillo the full amount under their agreement only upon receipt of a certificate of *disposal* from SafeWaste. Based on this evidence, the district court was correct in concluding that a rational trier of fact could determine that Diversey intended to dispose of Slurry and Eclipse that inspectors found stored at Fiorillo's warehouse.

### F. *Jury Instructions*

■■■■ Krueger argues that several of the jury instructions were incorrect. However, at trial, Krueger did not object to any of the jury instructions that he challenges here. Accordingly, this court will review the jury instructions only for plain error. *See United States v. Montgomery,* 150 F.3d 983, 997 (9th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 267, 142 L.Ed.2d 220 (1998). Under the plain error test, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. *See United States v. Morfin,* 151 F.3d 1149, 1151 (9th Cir.1998). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997)).

---

**31.** Of course, if a defendant shipper or transporter delivered explosive materials to a United States agency, and after taking control of those materials, the agency then independently delivered them to some non-governmental entity, the agency's post-receipt shipment would not take the shipper or transporter outside the protection of section 845(a)(3).

1. *The Distinction Between Hazardous Waste and Hazardous Material.*

■ Krueger believes that the instruction concerning hazardous waste was inadequate because it failed to alert the jury that it had to determine the generator's intent to decide if the material was discarded. We disagree. Essentially, this instruction told the jury if the material met a certain pH level and it was discarded material, it was hazardous waste. Within this instruction there was certainly room for Krueger to argue to the jury that the intent of the generator was crucial to the determination of whether the material was discarded. This instruction was not plainly erroneous.

2. *The Good Faith Defense.*

■ The defense offered a jury instruction to the judge concerning the good faith defense. After reviewing it, the judge offered a different instruction for defense counsel to consider. Krueger's lawyer looked at it and said, "Your Honor, on behalf of Mr. Krueger, I actually like this instruction better than the one that was proffered by the defense." In effect, Krueger's attorney adopted the court's instruction as his own and requested that the court give it to the jury. Where the court gives an instruction offered by a defendant, any error in that instruction is either unreviewable or reviewed only for plain error, depending on "whether the defendant intentionally relinquished or abandoned a known right." *United States v. Perez,* 116 F.3d 840, 845 (9th Cir.1997) (en banc). We need not determine whether the instruction in this case is subject to plain error review, however, because Krueger does not argue that the instruction was a flawed statement of the law. *See id.* at 845. Rather, he simply argues that it undercut his defense theory.

3. *Principles of Contract Law.*

■ Krueger advances the argument that because part of the fraud involved a contract between Krueger, Fiorillo and Diversey, the jury should have been instructed concerning principles of contract law. The Government counters that its theory of the fraud case was not based on the contract, but rather on the misrepresentations made to Diversey. The contract was used to show that Krueger and Fiorillo agreed to destroy the materials, not store them, but the Government relied on the certificates of disposal issued by Krueger to show fraud. Because the construction of the contract was not an issue in the case, the exclusion of any instruction concerning principles of contract law was not plainly erroneous.

4. *Foreseeability.*

■ According to Krueger, the district court also erred by not instructing the jury that it had to determine whether it was foreseeable that Fiorillo would be unable to convince Diversey to let him resell or recycle the Slurry and Eclipse and would nevertheless act as though he had secured such a deal, storing the material and billing for disposal. Although Krueger's argument is unclear, he seems to be saying that he was entitled to an instruction that would indicate he did not know what Fiorillo was doing.

Krueger was the one who prepared and signed all of the false certificates of disposal that were sent to Diversey. Clearly, he knew that he was sending out certificates of disposal for material that was stored in the warehouse. It seems unlikely that this instruction would have had any effect other than to confuse the jury. Failure to include this instruction was not plainly erroneous.

5. *The Knowledge Requirement of 42 U.S.C. § 6928(d)(1).*

■ Krueger also contends that the court improperly instructed the jury by stating, "The Government is not required to prove that the defendant knew his acts or omissions were unlawful" concerning the RCRA charges. Krueger believes that this conflicts with earlier instructions that told the jurors that the Government had to prove that the defendants were transport-

ing hazardous material with the knowledge that the material was waste and the knowledge that the facility to which they were transporting it lacked a permit. Krueger asserts that because transporting to a facility without a permit is illegal, knowledge that the facility lacked a permit would be knowledge that the act was unlawful. This is the conflict that Krueger asserts is plain error.

Nothing in the language of the statute requires the Government to prove that the defendants had the knowledge that their acts were unlawful. Section 6928(d)(1) requires the Government to prove that the defendants knew that the hazardous material was waste and that the facility it was being transported to lacked a hazardous waste permit. The instructions given by the district court were an accurate statement of the law. It was not plain error to give these instructions.

6. *The Knowledge Requirement of 18 U.S.C. § 842(a)(3)(A).*

■■■ Fiorillo testified that one of his employees told him that he had obtained the proper licenses for the company to store the explosives at the warehouse. Based on his testimony alone, Fiorillo wanted the district judge to provide an instruction that the Government had to prove that Fiorillo knew he did not have a permit to handle explosives and objected when the judge declined to provide such an instruction or an instruction on mistake of fact. Whether a jury instruction misstates elements of a statutory crime is a question of law reviewed *de novo*. *See United States v. Petrosian*, 126 F.3d 1232, 1233 n. 1 (9th Cir.1997), *cert. denied*, ——

U.S. ——, 118 S.Ct. 1101, 140 L.Ed.2d 156 (1998).

■■■ The district court was interpreting a statute. The statute in question, 18 U.S.C. § 842(a)(3)(A), states:

> (a) It shall be unlawful for any person
>
> . . . .
>
> (3) other than a licensee or permittee knowingly—
>
>> (A) to transport, ship, cause to be transported, or receive in interstate or foreign commerce any explosive materials . . . .

Fiorillo would read "knowingly" in this statute to modify the words that precede it. Under Fiorillo's interpretation the meaning of the statute would be, "it shall be unlawful for any person *who knows they do not have a license* knowingly to transport, ship, cause to be transported, or receive . . . explosive materials." The district court read "knowingly" to apply to the words that follow it. This court reviews a district court's interpretation of a statute *de novo*. *Doe*, 136 F.3d at 634.

We look first to the plain language of the statute. *See Sloan v. West*, 140 F.3d 1255, 1261 (9th Cir.1998). It stretches credulity to apply Fiorillo's interpretation to the statute.[32] Clearly, "knowingly" applies to the words that follow it: transport, ship, cause to be transported, receive. The statute requires the Government to prove that the recipient of the explosives did not have a license or permit, not that the recipient knew he did not have a permit.[33]

---

**32.** Fiorillo cites two Supreme Court cases to support his position, *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), and *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). These cases are not persuasive. In *Staples*, the Court dealt with a statute that lacked a *mens rea* element altogether, and in *X–Citement*, the Court stretched rules of grammar to extend "knowingly" in a statute to words far *beyond* it, not to words that *preceded* it.

**33.** Fiorillo alludes to a related instructional error regarding a "mistake of fact" instruction he requested at trial. In his brief, however, he provides no separate argument on this point and discusses neither the applicable law nor the facts. Accordingly, we do not consider the issue on this appeal. *See* Fed. R. App. P. 28(a). We note in this connection, however, that the evidence on the point was thin and highly unpersuasive, and that no unfairness or injustice will result, whatever the answer to the legal question may be.

## G. *Sentencing*

 This court reviews *de novo* the district court's interpretation and application of the sentencing guidelines. *See United States v. Barnes,* 125 F.3d 1287, 1290 (9th Cir.1997). The district court's application of the sentencing guidelines to the facts is reviewed for abuse of discretion. *See Id.* The district court's factual findings in the sentencing phase are reviewed for clear error. *See Id.*

### 1. *Amount of Loss.*

 Amount of loss is a finding of fact reviewed for clear error. *See United States v. Salemo,* 81 F.3d 1453, 1463 (9th Cir.1996). Fiorillo argues that the district court erred by determining the total amount of intended loss was the entire amount under the contract. Eleven truckloads of Slurry and Eclipse were delivered to Fiorillo and Krueger for disposal, and Diversey paid a total of $254,000 for that disposal. Because two of the eleven shipments were properly disposed of, Fiorillo contends that the amount of loss should be reduced by the amount Diversey paid for those two loads. We agree.

The court found that the contract between Fiorillo, Krueger and Diversey was fraudulent from its formation. In the contract, Krueger and Fiorillo agreed to dispose of the material in compliance with environmental laws. Because they never had permits and never made any effort to get appropriate permits, the court felt that the contract simply illustrated the defendants' fraudulent intent. However, Diversey did not suffer any loss as a result of the proper disposal of two loads of the hazardous material, and the amount of loss calculation should be amended accordingly. We reverse the district court's determination of amount of loss and remand with instructions to reduce the amount of loss by the amount Diversey paid for the proper disposal of the two loads that Krueger and Fiorillo sent to the RCRA facility in Nevada.

### 2. *Major Role.*

 The district court's determination that Fiorillo played a major role in the crime and was therefore eligible for an enhancement is a finding of fact reviewed for clear error. *See United States v. Ponce,* 51 F.3d 820, 826 (9th Cir.1995). The factors to be considered in determining whether to apply this enhancement include: "the exercise of decisionmaking authority, the nature of the offense and the defendant's participation in the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, and the degree of control and authority over others." *Id.* at 827.

 The district court found that Fiorillo ran the warehouse where the hazardous waste was stored, used his business to facilitate the fraud, and provided the opportunity and resources for Krueger to participate in the fraud. Additionally, there was evidence presented that Fiorillo made most, if not all, of the contacts with Diversey. A finding that Fiorillo played a major role based on the above conclusions is not clearly erroneous.

## H. *Fiorillo's Fine*

 Fiorillo asserts that there is an inconsistency between the court's oral pronouncement concerning his fine and the written judgment. The judge stated that Fiorillo could pay his fine upon his release from prison, but the written judgment indicates the fine is due in full immediately. We agree that there is an inconsistency between the judge's oral pronouncement and the written judgment. Because this case is being remanded to correct the amount of loss, the district court is also instructed to correct the written judgment so that it is consistent with the judge's earlier oral pronouncement.

## CONCLUSION

We AFFIRM the district court's conclusion that (1) the searches of the warehouse were proper; (2) severance of the explo-

sives charges from the RCRA charges was not required; (3) the defendants were properly convicted under 42 U.S.C. § 6928(d)(1); (4) the exceptions in 18 U.S.C. § 845 do not apply in this case; and (5) the Government provided sufficient evidence for the jury to conclude that appellants were handling hazardous waste. Additionally, the district court did not err in its jury instructions, nor in determining that a sentencing enhancement for Fiorillo playing a major role was appropriate. Finally, we REVERSE the district court's conclusion concerning the determination of the amount of loss and REMAND with instructions to correct that determination and to amend the judgment so that it is consistent with the judge's oral pronouncements concerning Fiorillo's fine.

The judgment is AFFIRMED in part and REVERSED and REMANDED in part.

T.G. NELSON, Circuit Judge, Specially Concurring in Part C:

I agree with the majority's conclusion that Fiorillo and Krueger caused the transportation of the hazardous waste under 42 U.S.C. § 6928(d)(1) and were, therefore, properly found guilty by the jury. Because I disagree with the majority's interpretation of the Government's argument, I write separately.

The majority writes that the Government argued that section 6928(d)(1) applies to those who do nothing more than receive hazardous waste. Although during oral argument the Government may have stated that Fiorillo and Krueger were liable under section 6928(d)(1) for simply receiving the hazardous waste, an examination of the Government's brief shows that the Government argued that section 6928(d)(1) was not limited to those who generate hazardous waste, not that section 6928(d)(1) should apply to those who simply receive hazardous waste. The majority agrees with the Government's argument that section 6928(d)(1) is not limited to generators of hazardous waste by concluding that it applied to Fiorillo and Krueger, who were not generators.

Additionally, the majority's discussion of whether section 6928(d)(1) applies to those who only receive hazardous waste is unnecessary. The facts show that Fiorillo and Krueger did more than receive the waste; they played an integral role in the transportation of the waste. The issue of whether section 6928(d)(1) applies to receivers of hazardous waste has no bearing on the outcome of this case, so any discussion concerning the act of simply receiving hazardous waste is dictum.